Sheila COOTS and Victor
Coots, Appellants,

v.

ALLSTATE INSURANCE
COMPANY, Appellee.

and

Nancy KITCHEN, Individually and as Administratrix of the Estate of Koren M. Kitchen and William T. Kitchen, Appellants,

v.

STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY,
Appellee.

Nos. 91–SC–929–TG, 92–SC–162–TG.

Supreme Court of Kentucky.

March 18, 1993.

Rehearing Denied July 1, 1993.

Grover S. Cox, Louisville, for appellants, Cootses.

A. Campbell Ewen, Benjamin C. Johnson, Ewen, Hilliard & Bush, Louisville, for appellee, Allstate.

William J. Kathman, Jr., Florence, for amicus curiae, KATA.

Richard M. Breen, Louisville, for appellants, Kitchens.

John G. Crutchfield, MacKenzie & Peden, P.S.C., Louisville, for appellee, State Auto.

## OPINION

LEIBSON, Justice.

These two cases, briefed separately, were argued on the same day and are decided in a single opinion because they involve common questions of law regarding further viability of an underinsured motorist policy covering the victim of a motor vehicle collision after settlement with the tortfeasor's liability insurance carrier for the policy limits.

Both cases were decided at the trial level by summary judgment in favor of the underinsured motorist insurance carrier based on the opinion handed down by the Kentucky Court of Appeals in *Kentucky Cent. Ins. Co. v. Kempf,* Ky.App., 813 S.W.2d 829 (1991), holding that when a tort victim covered by underinsured motorist protection settles his tort claim before obtaining a judgment against the tortfeasor, the victim has abrogated his right to underinsured motorist benefits, even though he has settled for the tortfeasor's policy limit. The principal issue in reviewing the present cases is whether *Kentucky Cent. Ins. Co. v. Kempf* represents an appropriate resolution of this issue.

In an effort to shorten the repeated references thereto, we will refer to underinsured motorist coverage as "UIM" coverage, and to the term "uninsured motorist coverage," where used, as "UM" coverage.

The *Kitchen* case is a wrongful death action filed on behalf of the estate of Koren M. Kitchen ("Karrie") who was killed when the car in which she was a passenger left the roadway and struck a tree. Both Karrie and the driver, Michael Jaeger, were seventeen years old. Along with the estate's claim for wrongful death damages, the parents sued, individually, seeking damages for loss of love and affection during the remainder of Karrie's minority. The defendants were Michael Jaeger and his father, John L. Jaeger, Jr., who allegedly owned and supplied the car. The Jaegers' liability insurance carrier, Allstate Insurance Company, agreed to pay the Kitchens the Jaegers' policy limits, $100,000, shortly before the trial. The settlement agreement provided for the Kitchens to release the Jaegers, but reserved their rights against State Automobile Mutual Insurance Company, their own automobile insurer whose policy included the UIM coverage now at issue. It also provided that Allstate would continue to defend the Jaegers.

In the Kitchens' lawsuit against the Jaegers their UIM insurer, State Automobile Mutual Insurance Company, was named as an additional defendant. In their automobile policy the Kitchens had paid separate premiums for UIM coverage on two different vehicles, and they claimed that the aggregate UIM coverage on these two automobiles at the time their daughter was killed was $120,000.

Shortly before trial the Kitchens settled with the tortfeasor's insurer, Allstate, for $100,000. The Kitchens intended to proceed to trial against their own insurer, State Auto, for the balance of their loss up to the UIM coverages limits, but were precluded from doing so by the trial court's summary judgment. The Kitchens intended for the jury to decide the total damages sustained by the Kitchens, who would then look to State Auto to pay the damages that exceeded the $100,000 up to the limits of State Auto's UIM coverage. This would be up to $120,000 if the coverage could be stacked.

Before reaching the coverage question, the trial court ruled that only one coverage in the amount of $60,000 was available, citing *LaFrange v. United Serv. Auto. Ass'n.,* Ky., 700 S.W.2d 411 (1985). Our opinion in *LaFrange* was *not* authority to so hold because *LaFrange* expressly stated that the "question of stacking because a separate ... premium for underinsured

motorist coverage was charged for each vehicle" was among the questions not reached in the opinion. *Id.* at 414. We stated, "the facts of this case do not cross the threshold question posed by the 'offset' language in the statute [1] and in the policy." *Id. LaFrange* also stated that the question as to "what consequences flow from effecting a partial settlement with the tortfeasor in which the full amount of damages remained undecided" was *not* reached. *Id.* We specified:

"Nothing in this opinion [*LaFrange*] shall be construed as deciding any of these problems." *Id.*

The *Kitchen* case presents the issues left on the table in *LaFrange.*

In the *Coots* case, Sheila Coots and her husband, Victor Coots, who had their own automobile insurance (including UIM coverage) with Allstate Insurance Company, Inc., sued Neal South for injuries sustained by Sheila Coots when her car was struck from the rear by South's truck on December 29, 1987. South had liability insurance with State Farm Mutual Insurance Company. After the suit against South had been tried to verdict and the verdict had been set aside as inadequate on motion for new trial, State Farm tendered South's liability insurance limits, $50,000. Allstate was asked and refused to consent to this settlement or to agree to leave open whether there was further liability under the Coots' UIM coverage. The Cootses then accepted the tortfeasor's liability coverage limits without Allstate's consent, executing a settlement agreement dismissing their claims against the tortfeasor and his insurer and agreeing to fully indemnify these parties from any future claims. This release specifically indemnified the tortfeasor and State Farm against later "payout under the aforementioned ["Allstate"] underinsured motorist coverage," if any were necessary. The Cootses and the tortfeasor filed a pleading designated "Partial Agreed Order Dismissing Settled," specifying that only the plaintiffs' claims "against Defendant, Neal South, are dismissed as settled with prejudice." When this order was entered in court, Allstate, relying on the fact of settlement and the release accompanying it, moved for summary judgment. Allstate argued that because the release "precludes any further action against Mr. South, and thereby, the possibility of any judgment against Mr. South in excess of his liability coverage of $50,000," Allstate's obligation under its UIM coverage for damages in excess of the tortfeasor's policy limits was cut off. As in *Kitchen*, the trial court sustained the UIM carrier's motion for summary judgment, citing *Kentucky Cent. Ins. Co. v. Kempf, supra.* In *Kitchen* the issue regarding the stacking of UIM coverage was ruled on prior to summary judgment, but in *Coots* the trial court did not rule on it.

Because these two cases represent a number of issues of general public importance which have surfaced regarding UIM coverage, we granted transfer of the appeals in both cases.

These issues are:

1) Does a settlement with the tortfeasor's liability carrier for the liability policy limits before obtaining judgment against the tortfeasor abrogate the UIM insured's right to pursue his UIM coverage?

2) What is the impact of the UIM insurer's contractual right of subrogation on the UIM insured's right to settle the claim against the tortfeasor?

3) In suing the UIM insurer, does the UIM insured have a right to designate the UIM insurer as a defendant by name, and pursue a direct action against it, or should the tortfeasor be named as a party defendant?

4) Does the UIM insured have the right to stack UIM coverages separately paid for in a single automobile policy?

## I. DOES SETTLEMENT OF THE CLAIM AGAINST THE TORTFEASOR PRECLUDE A FURTHER CLAIM FOR UIM BENEFITS?

We start with the underinsured motorist statute, KRS 304.39–320, which now provides:

---

1. Language deleted in the 1988 Amendment to the UIM statute, KRS 304.39–320.

"(1) As used in this section, 'underinsured motorist' means a party with motor vehicle liability insurance coverage in an amount less than a judgment recovered against that party for damages on account of injury due to a motor vehicle accident.

(2) Every insurer *shall make available upon request* to its insureds underinsured motorist coverage, whereby subject to the terms and conditions of such coverage not inconsistent with this section the insurance company *agrees to pay* its own insured for such *uncompensated damages* as he may recover on account of injury due to a motor vehicle accident because the judgment recovered against the owner of the other vehicle exceeds the liability policy limits thereon, to the extent of the under-insurance policy limits on the vehicle of the party recovering." [Emphasis added.]

This statute was originally enacted in 1974 as Subsection 32 of the Motor Vehicle Reparations Act ("MVRA") of 1974. It mandates that (1) "upon request" automobile insurers must include underinsured motorists coverage within their policy. The MVRA elsewhere requires:

(2) Unless specifically "rejected" (KRS 304.39–030), automobile insurers must provide basic reparation benefits ("BRB") which "shall be paid without regard to fault" (KRS 304.39–040(1)); and,

(3) For compulsory tort liability insurance (KRS 304.39–110).

All three of these coverages are *mandatory* in the sense that the automobile insurer is *required by statute* to provide such coverage: the underinsured motorist coverage if the insured requests it, the no-fault coverage unless the insured rejects it, and minimum limits tort liability coverage with no option. The carrier has *no option* whether it wishes to offer these coverages if it sells policies in Kentucky. All of the coverage provided for in the MVRA is so provided to carry out the "policy and purpose" of the statute as specified in KRS 304.39–010, which include: in subparagraph (3), "[t]o encourage prompt medical treatment and rehabilitation of the motor vehicle accident victim by providing for prompt payment of needed medical care and rehabilitation"; and in subparagraph (5), "[t]o reduce the need to resort to bargaining and litigation through a system which can pay victims of motor vehicle accidents without the delay, expense, aggravation, inconvenience, inequities and uncertainties of the liability system."

Underinsured motorist coverage is a younger sibling to statutory uninsured motorist coverage, which was provided for in KRS 304.20–020, enacted in 1970. UM coverage must be included in every automobile insurance policy unless rejected. From its inception, we have recognized UM coverage is *first party coverage*, which means that it is a contractual obligation directly to the insured which must be honored even if the tortfeasor cannot be identified. *See First Nat'l Ins. Co. v. Harris*, Ky., 455 S.W.2d 542 (1970). *See also Puckett v. Liberty Mut. Ins. Co.*, Ky., 477 S.W.2d 811 (1971), holding the carrier may be sued without first obtaining a judgment against the uninsured motorist, or without the uninsured motorist being a party to the suit, albeit the potential liability of the uninsured motorist and the amount of damages he caused must be established in the suit against the insurer in order to measure the insurer's obligation to the insured under the policy. With both UM and UIM coverage there must be a tortfeasor, and in the case of UIM coverage, the damages inflicted must exceed the tortfeasor's liability insurance. But these factors do *not* make the tortfeasor a party to the insurance contract. UM coverage exists without regard to whether the obligation of the tortfeasor can be reduced to judgment, and there is no logical way to explain UIM coverage differently.

UIM coverage serves the same purpose and follows the same pattern as UM coverage. While the wording of the UIM statute is different from that of the UM statute, we can discern no fundamentally different insurance arrangement from that provided for under the UM statute. *Puckett* speaks to the situation where "the accident has occurred elsewhere and the unin-

sured motorist is a nonresident who is not amenable to process in this state," holding that the insurer's obligation cannot be defeated by this circumstance and a "policy provision giving the insurer an absolute right to require joinder [of the tortfeasor] ... must be held unenforceable." *Id.* at 814. Speaking to the subrogation right thus destroyed, the court states that although that "appears to be an unavoidable consequence" in this case:

> "... insurance against uninsured motorists owes its existence to the probable and usual worthlessness of a claim against an uninsured tortfeasor. The policy of our statute places the insured party's right to sue in this state above the dubious value of the insurer's right of subrogation." *Id.*

When the UIM statute speaks in terms of measuring the insurer's liability by "the judgment recovered against" the underinsured motorist, the intent of the language is no different when the UM statute speaks to the amount the insured is "legally entitled to recover ... from owners or operators of uninsured motor vehicles" as the measure of the insurer's liability.

■ Indeed, UM coverage and UIM coverage are treated coextensively in many standard insurance policies, and in some cases are offered as a combined coverage. In both, proof the offending motorist is a tortfeasor and proof of the amount of damages caused by the offending motorist are not preconditions to coverage, but only essential facts that must be proved before the insured can recover judgment in a lawsuit against the insurer on the contract of insurance. That the insurance industry, itself, recognizes that "judgment" against the tortfeasor is not a precondition to the insurance claim is illustrated by the language in the Kitchens' policy, which premises liability upon "payment of judgments or settlements." Because of this language the Kitchens argue that they are entitled to settle with the tortfeasor and proceed against their UIM carrier who refused to consent to the settlement under the language of their own policy, regardless of statutory interpretation. But we do not

reach this issue because the only rational interpretation of the statute is, while the policy limits specified in the tortfeasor's policy must be exhausted before the UIM carrier has an obligation to pay, the liability of the tortfeasor and the amount of damages sustained are elements that must be established in measuring the UIM carrier's obligation and not a statutory precondition to coverage. This is consonant with our earlier decision in *LaFrange v. United Serv. Auto. Ass'n, supra,* the *only* prior UIM coverage case decided by our Court. *LaFrange* states:

> "KRS 304.39–320, 'Underinsured motorist coverage,' is part of the Motor Vehicle Reparations Act (MVRA), and, as such, is *remedial legislation* which should be generally *construed to accomplish its stated purposes.*" [Emphasis added.] *Id.* at 413.

When viewed in terms of the MVRA's "stated purposes," *infra,* the coverage the statute intended cannot be accommodated if the statute is construed to require the insured to pursue to judgment the underlying tort claim in every instance. The UIM carriers argue the words of the statute should be applied literally and without regard to the resulting absurdity, but our rule of statutory construction does not go that far. Our "duty" is

> "... to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *Bailey v. Reeves,* Ky., 662 S.W.2d 832, 834 (1984).

As stated in *Board of Educ. v. Logan Aluminum, Inc.,* Ky., 764 S.W.2d 75, 78 (1989):

> "Our mandate does not demand tunnel vision but reasoned analysis of the statutory scheme."

Here, as in *Board of Educ. v. Logan Aluminum, Inc.:*

> "[T]he overall statutory structure is of compelling persuasion in construing the statutes that we are now called upon to apply.... We must assume that the legislature intended to create a workable procedure and construe the statutes involved to provide one rather than acced-

ing to a hypertechnical literal interpretation that would lead to a wholly unreasonable conclusion." *Id.* at 80.

More succinctly, as stated by Justice Palmore in *Cantrell v. Kentucky Unemployment Ins. Co.*, Ky., 450 S.W.2d 235, 236–37 (1970):

"[W]e do not believe the circumstances of this case require any fol do rol about strict or liberal construction in order to arrive at the correct solution. When all else is said and done, common sense must not be a stranger in the house of the law."

Widiss, *Uninsured and Underinsured Motorist Insurance*, 2d Ed. (1992), the most exhaustive treatise on the subject, states:

"A persuasive case can be made for the proposition that underinsured motorist coverage should be available whenever an insured's damages exceed the amount of indemnification actually provided to an individual claimant by an insured driver's liability insurance. As noted in the discussion of the statutory provisions, this result is expressly mandated in several states [Ohio and Washington cases cited]. However, of at least equal importance is the fact that this approach has also been applied by courts in several states in which the statutes are not expressly framed in this way [Florida and Minnesota cases cited]." Vol. 3, Sec. 35.3, p. 53.

In 1988 the UIM statute was amended to address the problem with which we were confronted in *LaFrange v. United Serv. Auto. Ass'n, supra,* the so-called "offset" language formerly in the statute. The General Assembly added Subsection (1) defining the term "underinsured motorist," and deleted from Subsection (2): "to the extent of the policy limits on the vehicle of the party recovering less the amount paid by the liability insurer of the party recovered against." In *LaFrange* we had held this meant that the UIM coverage was not triggered unless the policy limits of the insured's automobile policy exceeded the policy limits of the tortfeasor's policy.

The 1988 change in statutory language eliminated the offset problem. We do not construe the amendments as changing the fundamental characteristics of UIM coverage. Before, as well as after, the statute defined the measure of the amount recoverable under a UIM policy as "such uncompensated damages as he [the UIM insured] may recover on account of injury due to a motor vehicle accident because the *judgment* recovered against the owner of the other vehicle exceeds the liability policy limits thereon." [Emphasis added.] KRS 304.39–320(2). The reference is to "judgment," not "judgment or settlement," because the latter phrase would destroy the context. There is no magic in the definition of "underinsured motorist" added by Subsection (1) that transforms underinsured motorist coverage to an umbrella policy for the tortfeasor. We conclude that it does not abrogate UIM coverage to settle with the tortfeasor and his carrier for the policy limits in his liability coverage, so long as the UIM insured notifies his UIM carrier of his intent to do so and provides the carrier an opportunity to protect its subrogation, as we will discuss in the next section of this Opinion.

We recognize that the Court of Appeals has held otherwise in *Kentucky Cent. Ins. Co. v. Kempf, supra. Kempf* attempted a literal interpretation of the word "judgment" as used in KRS 304.39–320, without regard to whether it made sense in the context of the coverage the statute intended to provide, and held that the "insured must obtain a judgment [against the tortfeasor] before claiming underinsurance benefits from its insurer." *Id.* at 831. Under this construction, even in the most flagrant case where an automobile accident victim has losses far in excess of the tortfeasor's policy limits, the remedial purpose of the MVRA, and the duty to negotiate for payment of the underinsured motorist coverage under the Unfair Claims Settlement Practices Act (KRS 304.12–230) and the Consumer Protection Act (KRS 367.170) would be abrogated. As frankly stated in the *Kempf* opinion, under its aegis "[i]nsurers need not worry about first party bad faith or unfair claims settlement practice

charges.... We are aware that this is contrary to the usual position of the law, which is to encourage settlements...." *Id.* at 832. The Court of Appeals reached this result because it believed that it was necessary to do so to "pay heed to the intent of the legislature." *Id.* We have reached the opposite result and overrule *Kempf.*

## II. SUBROGATION

In 1990, the UIM language in KRS 304.-39–320 was amended a second time, this time deleting the last sentence in the statute, which said:

"His [the UIM insured's] insurance company shall be subrogated to any amount it so pays, and upon payment shall have an assignment of the judgment against the other party to the extent of the money it pays."

Just as we construed the 1988 amendment as effecting a clarification and not a fundamental change in the nature of the statutory coverage, we construe the 1990 change in statutory language as intending only a clarification. Surely, UIM insurers now have the same right to include within their policy a right of contractual subrogation against the tortfeasor as they did before the statutory change. What the statutory change does is recognize that the subrogation right cannot be absolute because in some instances it is inimical to the right of the UIM insured to settle with the tortfeasor and his liability insurer for the policy limits. This is so because, before making such payment of the policy limits the tortfeasor's insurer will routinely demand, as was done in the present cases, full release and indemnification against future claims against the tortfeasor by the UIM carrier. Indeed the liability carrier's obligation to its own insured to defend in good faith requires that it extract such a release rather than leave its own insured unprotected. The 1991 statutory change recognizes that there is potential for this irreconcilable clash of interest.

If UIM coverage is to accomplish its remedial purpose as intended by the MVRA, the UIM carrier's contractual subrogation right must not obstruct the UIM insured's right to settle for the policy limits even if it means releasing subrogation.

As stated in Widiss, *supra,* § 44.4, p. 129–30:

"*3. Subrogation is Inimical to the Underinsured Motorist Coverage*

The fundamental characteristic of the underinsured motorist insurance is that it is only relevant when the tortfeasor's insurance is not adequate to provide indemnification. When this is the case, the assertion of a right of subrogation—by the underinsured motorist insurer in regard to the tortfeasor or the tortfeasor's insurer—is inimical to the very character of the underinsured motorist coverage so long as the insured has not been fully indemnified. The proposition that an insurer should be precluded from seeking reimbursement unless the insured has been fully indemnified seems to be almost *beyond rational dispute.*" [Emphasis added.]

Thus we construe the 1990 statutory change, deleting the last sentence referring to the insurance company's right of subrogation, as recognizing the essential nature of such coverage rather than as deleting a right of subrogation that otherwise existed before that date. With or without the change, the legislation must be construed to effect its purpose, and the present policies must be construed likewise.

As stated by the Louisiana Supreme Court in *Carona v. State Farm Ins. Co.,* 458 So.2d 1275, 1279 (La.1984):

"Since full recovery is the goal of the legislation and because the tortfeasor and the UM carrier are codebtors *in solido,* we infer that a victim merely by his release of the tortfeasor does not forfeit any right against his UM carrier."

■ We are aware of our decision regarding indemnity and restitution in *Crime Fighters Patrol v. Hiles,* Ky., 740 S.W.2d 936 (1987). In it we applied common law principles of tort and indemnity, holding that the release of a tortfeasor who is primarily liable for causing an injury operates to release another tortfeasor who is

only secondarily liable. The difference is that the UIM carriers are not tortfeasors secondarily liable, but, as stated by the Louisiana Supreme Court, "codebtors *in solido*," which means a different party who is also *primarily* liable. The UIM insurer is a primary obligor for the UIM insured's loss by contractual obligation just as the tortfeasor is a primary obligor by reason of his tort obligation. Insofar as its UIM obligation is concerned, as we have stated in Part I of this Opinion, the existence of the tortfeasor; and the amount of damages caused by the tortfeasor, and the tortfeasor's insurance or lack thereof, are only relevant to measure the loss under the policy.

■ This is not to say the UIM carrier's contractual subrogation should be totally disregarded. It should be disregarded only to the extent it is in conflict with the UIM insured's superior right to accept the tortfeasor's policy limits when offered, when to do so requires executing a release and indemnity agreement.

Again, turning to Widiss, *supra*, § 43.5, p. 122:

"... if the claimant has initiated a lawsuit against the tortfeasor, the settlement agreement will usually require the claimant to agree to have that suit 'dismissed with prejudice' so that no further legal action is possible.

The loss of an insurer's subrogation right may not be significant. In many instances, pursuit of any recovery from an insured tortfeasor beyond the available liability insurance would be fruitless."

■ Addressing those cases where the UIM insurer believes the tortfeasor has substantial assets beyond his policy limits which should be pursued when those limits are paid, the Minnesota Supreme Court has offered UIM insurers a viable solution to their dilemma in *Schmidt v. Clothier*, 338 N.W.2d 256, 263 (Minn.1983):

"The underinsurer, however, will have this subrogation right against the tortfeasor only if it has paid underinsurance benefits prior to release of the tortfeasor. Thus, the underinsurer is entitled to

notice of the tentative settlement and an opportunity to protect those potential rights by paying underinsurance benefits before release."

Under this approach, if the UIM carrier, having been notified that the tortfeasor's carrier has tendered its policy limits in return for a general release, recognizes that the potential subrogation claim has substantial value in excess of the tortfeasor's liability limits, i.e., it believes its subrogation right may be significant rather than simply illusory, as further stated in *Schmidt v. Clothier:*

"... the underinsurer could substitute its payment to the insured in an amount equal to the tentative settlement. In this situation, the underinsurer's payment would protect its subrogation rights to the extent of the payment, and the insured would receive the amount of the settlement offered in cash." *Id.*

The effect of our holding is to encourage both the tortfeasor's liability insurer to provide prompt settlement where the situation calls for it, and to provide incentive for the UIM carrier to do likewise, thus accommodating the policy and purpose of the MVRA. The UIM carrier cannot refuse to negotiate a one million dollar claim until the UIM insured can process a claim against the tortfeasor covered by a $25,000 limit liability policy to judgment.

Allstate, in its brief to our Court, has suggested a different approach "would be for this Court to recognize that the right to subrogation does not arise until such time as the underinsured motorist carrier makes a payment ... and, therefore, any release which might have been executed by the injured party in favor of the tortfeasor prior to that payment would be ineffectual to actually dismiss any subrogation claim." Under this solution the underinsured motorist would be free to sign the release tendered by the tortfeasor and its insurance carrier even though it is agreed that the tortfeasor and his liability carrier are released from all future obligations, but the UIM carrier, upon subsequent payment under its policy to its insured, could proceed against the tortfeasor notwithstand-

ing the release. Allstate would have us hold that the release would be totally ineffective to block the later claim. Of course, Allstate fails to explain, and cannot explain, how, if this were to be so declared as the state of the law, the tortfeasor's liability carrier could ever take a release leaving its insured exposed without the coverage provided in his liability policy, both to defending himself in court and paying any future judgment obtained by the UIM carrier. The short answer to the Allstate solution is that it is no solution because no liability carrier, commensurate with the duties under its liability policy, could ever pay its policy to the injured victim and take a release without exposing itself to the charge of dealing in bad faith with its own insured.

Nor do we write without recognizing that the claimant may execute a release recognizing he intends to release not only the tortfeasor but his own UIM carrier, specifying he has been "fully compensated for all damages and the release constitutes payment in satisfaction of all claims." *Richardson v. Eastland, Inc.*, Ky., 660 S.W.2d 7, 9 (1983). The principles stated in *Richardson* apply to cases involving UIM coverage when appropriate. But in the present cases, taken as a whole, the settlement agreements and releases involved made it clear that, although the claimant was releasing the tortfeasor, the damages paid were only partial satisfaction for the loss sustained and the intent of the insured was to preserve its UIM claim.

### III. DIRECT ACTION

The UIM carriers have raised as a collateral issue whether they should be able to defend before the jury in a suit against the UIM carrier in the name of the tortfeasor rather than in their own name, claiming that it is fundamentally unfair to take aim against them as a target defendant. At this point in the evolution of jurors to the point where many are painfully aware of the cost of their own insurance premiums, one might speculate as to whether an insurance company is really a target defendant, or whether it is as much of a target defendant as corporations from other industries with whom jurors have no identifiable financial interest, corporations which, when sued, must defend in their own name. In any event, without indulging in any such speculation, we must recognize that the suit to recover UIM coverage is a direct action no different from a suit to recover UM coverage (discussed *supra*, Part I), and we are not free to create legal fictions. The tortfeasor is not a party unless the UIM carrier elects to advance the amount of the policy limits of the tortfeasor's policy so as to avoid his release. Then the UIM carrier has the option to keep the tortfeasor in the case by naming him as a third party defendant upon whom ultimate liability will be fixed by virtue of subrogation.

There is no more reason to create a legal fiction by substituting the name of the tortfeasor for the UIM carrier, when the carrier alone is the real party in interest in UIM cases, than there is reason to do so when dealing with UM coverage. The issue of permitting a "legal fiction" to be employed has been laid to rest in uninsured motorist claims which involve a direct action against the UM carrier in *Wheeler v. Creekmore*, Ky., 469 S.W.2d 559 (1971). Underinsured and uninsured carriers should be treated similarly, as their purpose and the intent of their coverage is similar.

### IV. STACKING

Fortunately, the stacking issue can be addressed in this opinion much more succinctly than the procedural issues discussed in Parts I, II and III. It is a contractual issue, related solely to construing the insurance policies involved in light of their terms and of previous decisions of our Court related to similar questions in uninsured motorist insurance coverage cases.

In the *Coots* case the UIM carrier points out that "[t]he Trial Court did not even rule on the stacking question," having "held that since *Kempf*, [*supra*] applied, underinsured motorist coverage stacking was not an issue in this matter." In the *Kitchen* case, like the *Coots* case, the final judg-

ment dismissed the claim on the basis that UIM coverage was precluded by *Kempf,* but the court had made a previous ruling that stacking was not available under the terms of the Kitchens' policy. Kitchens' UIM carrier, State Automobile Mutual, argues vehemently that "stacking of uninsured motorist insurance coverage was not decided by the trial court in this case and thus is not on appeal." We disagree that it was not "decided," but we agree that it was a preliminary ruling, that the issue has not been finally decided in the trial court, and that it is not on appeal.

Further, it has yet to be factually determined that the damages sustained by either the Cootses or the Kitchens is in an amount that exhausts and exceeds the limits on any one of the cars in their UIM policies so as to raise the question of additional coverage to the level of a case in controversy rather than simply a request for an advisory opinion.

## V. CONCLUSION

We reverse and remand both of these cases for further proceedings consistent with this Opinion. Consistent with this Opinion, the UIM insureds retain the right to pursue their UIM claim against the UIM carriers even though they have received payment from the liability insurers of the alleged tortfeasors. Because these cases are already in a posture where the UIM insureds have been paid the policy limits of the alleged tortfeasors, if the UIM carriers in these cases wish to protect their contractual subrogation interests against the alleged tortfeasors and their liability carriers, the UIM insurers shall have the option to repay the settlement sums to the liability carriers and thereafter pursue the alleged tortfeasors and their carriers for any further sums for which the UIM carriers become legally obligated to the UIM insureds under the UIM policy.

We express neither approval nor disapproval of the previous preliminary ruling on the stacking issue in the *Kitchen* case. Both trial courts will be free to consider this issue in due course.

COMBS, LAMBERT, LEIBSON and REYNOLDS, JJ., concur.

SPAIN, J., concurs in result only by separate opinion in which STEPHENS, C.J. and WINTERSHEIMER, J., join.

SPAIN, Justice, concurring in result.

Respectfully, I concur only in the result reached by the majority. In doing so, I too would reverse the summary judgments granted by the trial courts to the respective UIM carriers and would remand for further proceedings under the UIM coverages of the policies.

I also would overrule *Kentucky Cent. Ins. Co. v. Kempf,* Ky.App., 813 S.W.2d 829 (1991), because in that case, as in the two before us today, the UIM policy coverage became payable *not only* in the event of and after the insured obtained a judgment against the underinsured motorist, *but also in the event of a settlement.* As a matter of fact, the opinion of the Court of Appeals states "... it is clear that the policy itself allows settlements by the insured with the underinsured motorist." *Id.* at 830. The opinion, however, failed to address the effect which that court's literal application of KRS 304.39–320 had in impairing the contract of insurance entered into between the UIM insured and his insurer.

In my view, insufficient importance was attached to the clear and unambiguous language of the insurance contract between the parties vis-à-vis the language of the statute. I prefer to harmonize the two by interpreting the statute as only requiring the UIM insured to obtain judgment against the tortfeasor or underinsured motorist before proceeding against his UIM insurer, *if* the UIM coverage language in his policy does not authorize payment in the event of settlement. In other words, if the coverage provided by the insuring agreement is broader than the requirement of the statute, the contract will govern the rights and obligations of the parties.

Applying this rule to both the *Kitchen* and *Coots* cases would require reversal of the summary judgments rendered in favor of both UIM insurers. Both judgments

were occasioned by the failure of the UIM insureds to obtain judgments against their tortfeasors or underinsured motorists, as required by *Kempf,* notwithstanding the fact that both insurance policies afforded UIM coverage after termination of the liability claims by "judgments or settlements."

As I read the majority opinion, however, it cavalierly repudiates the statute in question without any regard to the fact that there were broader coverages under the policies before us in the *Kitchen* and *Coots* cases as well as in the *Kempf* case. This seems not only unnecessary but also a bit gratuitous to me.

Having said that I would hold that both the Cootses and the Kitchens were free to settle their claims under their policies of insurance as against their respective tortfeasors notwithstanding the statutory reference to "judgment," I now address the question of whether the Cootses and Kitchens breached their contracts of insurance by impairing the subrogation rights of their own respective UIM carriers.

First of all, I note that in 1990 the UIM language in KRS 304.39–320 was again amended so as to delete the following sentence from the statute:

His [the UIM insured's] insurance company shall be subrogated to any amount it so pays, and upon payment shall have an assignment of the judgment against the other party to the extent of the money it pays.

Notwithstanding this deletion, I would hold that both UIM carriers in the cases at hand retained their common law rights of subrogation. *Henderson v. Selective Ins. Co.,* 242 F.Supp. 48 (E.D.Ky.1965). I am further of the opinion that such a potential right of subrogation does not actually accrue or become vested until such time as the UIM carrier makes a payment under that portion of the policy. *Employers Mutual Ins. Co. v. Griffin Constr. Co.,* Ky., 280 S.W.2d 179 (1955). Therefore, any release executed by the Cootses or the Kitchens in favor of their respective tortfeasor or said tortfeasor's liability carrier was ineffectual to abrogate or terminate any po-

tential subrogation claim of the respective UIM carrier. Just as an injured party may not release a subrogation claim belonging to a reparations obligor under the Kentucky No–Fault Statute, KRS 304.39–070, by executing a release in favor of a tortfeasor; similarly, a UIM insured would have no right or standing to release a potential subrogation claim belonging to the UIM carrier only.

STEPHENS, C.J., and WINTERSHEIMER, J., join in this concurring opinion.