KENTUCKY FARM BUREAU
MUTUAL INSURANCE
COMPANY, Appellant,

v.

Tina RODGERS, Now Johnson,
Appellee.

No. 2002–SC–1044–DG, 2002–
SC–001044–DG.

Supreme Court of Kentucky.

Sept. 22, 2005.

Rehearing Denied Jan. 19, 2006.

Michael D. Risley, Bethany A. Breetz, Stites & Harbison, Louisville, Michael J. Schmitt, Porter, Schmitt, Jones & Banks, Paintsville, KY, Counsel for Appellant.

M. Austin Mehr, Wesley Brian Deskins, Austin Mehr Law Offices, PSC, Paul Emmanuel Salamanca, Lexington, KY, Counsel for Appellee.

E. André Busald, Busald Funk Zevely, PSC, Florence, KY, Counsel for Amicus Curiae United Policyholders.

## OPINION OF THE COURT

Tina Rodgers (now Johnson) brought this action in the Lincoln Circuit Court against Kentucky Farm Bureau Mutual Insurance Company ("Farm Bureau") alleging that Farm Bureau acted in "bad faith" in negotiating her claim under the underinsured motorists (UIM) coverage of her policy in violation of KRS 304.12–230, the Unfair Claims Settlement Practices Act (UCSPA). *See State Farm Mut. Auto. Ins. Co. v. Reeder,* 763 S.W.2d 116 (Ky.1988) (KRS 446.070 authorizes a cause of action for damages arising from a violation of the UCSPA). A jury awarded Rodgers $30,000.00 in compensatory damages and $1,000,000.00 in punitive damages. The trial court entered judgment accordingly and also awarded Rodgers attorney fees of $16,666.00 and costs of $2,704.00. The Court of Appeals affirmed. We granted discretionary review and now reverse and remand for a new trial because of the admission of improper "bad acts" evidence in violation of KRE 404(b) and *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). This obviates the need to address whether the punitive damages award violates the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution as analyzed in *Campbell.*

Rodgers suffered injuries to her neck, left shoulder, and left thumb when a vehicle operated by Pearly Webb struck her vehicle. Webb had an automobile insurance policy with Omni Insurance Company that provided liability coverage with limits of $25,000.00 per person. Rodgers's automobile policy with Farm Bureau provided basic reparations benefits (BRB) coverage with limits of $10,000.00, medical payments coverage with limits of $500.00, and UIM coverage with limits of $50,000.00. Rodgers's injuries required excision of a small sesamoid bone from her left thumb and

arthroscopic surgery to remove scar tissue around a tendon in her left shoulder. She also incurred substantial expenses for chiropractic treatment. Farm Bureau voluntarily made BRB payments directly to Rodgers's medical providers, finally exhausting the combined $10,500.00 limits of its BRB and medical payments coverages on March 31, 1998.

On June 19, 1998, Omni offered its liability policy limits of $25,000.00 to settle Rodgers's tort claim against Webb. On June 22, 1998, pursuant to KRS 304.39–320(3) and *Coots v. Allstate Insurance Co.*, 853 S.W.2d 895, 902 (Ky.1993), Rodgers's attorney, Robert McClelland, notified Farm Bureau in writing of the proposed settlement and demanded payment of Farm Bureau's UIM policy limits. Farm Bureau did an "assets check" on Webb to determine whether it should make a "*Coots* substitution" to protect its subrogation right. KRS 304.39–320(4); *Coots*, 853 S.W.2d at 902. Ultimately, Farm Bureau adjuster Gary Montgomery notified McClelland that Farm Bureau would not make the substitution and that Rodgers could accept Omni's $25,000.00 offer.

During a subsequent telephone conversation between McClelland and Farm Bureau adjuster Terry Lester, McClelland demanded payment of Farm Bureau's $50,000.00 UIM coverage limits. Lester offered $10,000.00, representing a total claim evaluation of $45,000.00, *i.e.,* $10,000.00 in BRB already paid that would be deducted from any tort judgment per *Beckner v. Palmore*, 719 S.W.2d 288, 289 (Ky.App.1986); $25,000.00, representing Omni's liability limits already paid and which would also be deducted from any tort judgment per KRS 304.39–320(2) (UIM coverage payable only to the extent judgment exceeds tortfeasor's liability coverage); and the $10,000.00 UIM settlement offer. McClelland refused the coun-

teroffer, and no further negotiations ensued. In the subsequent UIM action, a jury awarded Rodgers damages totaling $98,618.00, being $53,618.00 more than Lester's evaluation. Rodgers then filed this action claiming that Farm Bureau acted in bad faith in offering only $10,000.00 of its UIM coverage to settle her claim.

██ Farm Bureau filed a motion *in limine* to suppress evidence about "the Mabel Raines case." Raines proposed to testify that she had been involved in a separate automobile accident and that Farm Bureau had also acted in bad faith in negotiating her claim. The motion was overruled on the record. That sufficed to preserve the issue for review, and Farm Bureau was not required to further object at trial. KRE 103(d); *Davis v. Commonwealth*, 147 S.W.3d 709, 722–23 (Ky.2004). Rodgers's assertion that Raines's testimony was rendered harmless when essentially the same information was elicited during the testimony of Raines's attorney, Paul Hibberd, is erroneous. Farm Bureau's motion *in limine* was not addressed to suppression of testimony "*by Mabel Raines*", but to suppression of testimony "*about the Mabel Raines case*". However, as will be discussed, *infra*, some of Hibberd's testimony on cross-examination was admissible for the purpose of impeachment.

██ At trial, Raines testified that she was injured in an automobile accident on January 20, 1996, twenty-one months prior to Rodgers's accident; and that the operator of the other vehicle, Lecia True, had a policy of liability insurance with Farm Bureau with limits of $100,000.00 per person. Raines complained that Farm Bureau initially offered her only $14,000.00, then increased the offer to $31,000.00 prior to trial, and finally paid its policy limits of $100,000.00 only after her testimony at

trial on February 25, 1998. However, Raines also sued her own UIM carrier and the UIM carrier of her domestic companion. Thus, despite her settlement with Farm Bureau, her case proceeded to a verdict awarding her a total of $219,071.00. The case was ultimately appealed to this Court on issues of whether Raines could recover under the UIM coverage of her domestic companion's insurance policy, and whether she could recover the excess verdict against True, despite her acceptance of a *Coots* settlement from True's insurer, Farm Bureau. She eventually lost on both issues. *See generally True v. Raines,* 99 S.W.3d 439 (Ky.2003).

Raines testified in the case *sub judice* that the Farm Bureau adjuster who handled her claim was Richard Smith, that she believed he worked out of Danville, but that she had never met him. Raines's attorney, Hibberd, also testified in the case *sub judice,* but was never asked to identify the Farm Bureau adjuster who negotiated Raines's claim. Attorney Robert Baker, who represented True on behalf of Farm Bureau, testified that an adjuster out of Lexington handled Raines's claim. Terry Lester, the Farm Bureau adjuster who handled this case, is the office manager of Farm Bureau's Somerset office, and there is no evidence that he was involved in any aspect of Raines's case.

Richard Smith's only involvement in this case was to write letters to Webb's insurer, Omni, demanding *payment to Farm Bureau* of BRB payments that Farm Bureau made on behalf of Rodgers. *See* KRS 304.39–070(3) (reparation obligor having paid BRB to injured insured is entitled to reimbursement directly from reparation obligor of person at fault). Neither Farm Bureau's claims file nor any other evidence offered at trial indicates that Smith was involved in the handling of Rodgers's UIM claim. Rodgers, herself, did not testify

that she had any personal communication with Farm Bureau about her UIM claim and did not identify the person who handled her BRB claim (concerning which she does not assert any "bad faith"). Farm Bureau's claims file indicates that Tammie Bullock handled Rodgers's BRB claim. Rodgers's attorney, McClelland, testified that he initially corresponded with Gary Montgomery about the UIM claim but that his subsequent negotiations were with Lester. He did not testify to any communications with Richard Smith.

In summary, Farm Bureau was the liability insurer of the tort defendant in the Raines case, thus providing primary coverage, but was only the UIM insurer in Rodgers's case, thus providing only secondary or excess coverage. *Motorists Mut. Ins. Co. v. Glass,* 996 S.W.2d 437, 453 (Ky.1997) (citing *Ohio Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 511 S.W.2d 671, 674 (Ky.1974)); *State ex rel. State Farm Mut. Auto. Ins. Co. v. Canady,* 197 W.Va. 107, 475 S.E.2d 107, 111 n. 4 (1996) (UIM coverage is only secondary coverage, analogous to excess liability insurance). In the Raines case, Farm Bureau paid its policy limits before the verdict, but the litigation continued because of Raines's claims against two other insurers. Thus, Raines, unlike Rodgers, did not incur additional damages in the form of litigation costs, expenses, and anxiety because of any perceived dilatoriness on the part of Farm Bureau in settling her liability claim. In fact, Raines never filed a bad faith claim against Farm Bureau. Although the same attorney represented Farm Bureau in both cases, the claims were negotiated by different adjusters working out of different claims offices. Attorney Baker testified that he needed authorization from Farm Bureau's Lexington adjuster before making his policy limits offer to Raines. No one testified to the nature of Raines's injuries or whether they

were similar to those sustained by Rodgers.

In *State Farm Mutual Automobile Insurance Co. v. Campbell,* which was also an appeal of a "bad faith" judgment against an insurance company, the United States Supreme Court sharply limited the use of evidence of other transgressions to prove entitlement to punitive damages.

*A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages.* A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . .

. . . Although our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance . . ., in the context of civil actions *courts must ensure the conduct in question replicates the prior transgressions* . . . .

. . . *Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages,* the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. . . . *The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance,* which in this case extended for a 20–year period. In this case, because the Campbells have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis. 538 U.S. at 422–24, 123 S.Ct. at 1523–24 (internal citations and quotations omitted) (emphasis added).

Although KRE 404(b) usually is cited in the context of a criminal case, it applies to civil cases as well. Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.25[2], at 125–26 (4th ed. LexisNexis 2003). *E.g., Ansell v. Green Acres Contracting Co., Inc.,* 347 F.3d 515, 521 (3d Cir.2003) (evidence of employer's conduct towards other employees admissible for purpose of establishing or negating discriminatory intent in age discrimination claim); *Hitt v. Connell,* 301 F.3d 240, 249–50 (5th Cir.2002) (evidence that employer had fired other employees for union activities admissible to prove motive to fire this employee for same reason). The rule precludes evidence of other acts of misconduct for the purpose of showing mere propensity or bad character but permits such evidence if relevant for another purpose, *e.g.,* proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The requirement in *Campbell* that the present conduct "replicates" the prior transgressions, 538 U.S. at 423, 123 S.Ct. at 1523, mirrors our requirement that to be admissible under KRE 404(b) to prove, *e.g.,* motive, intent, plan or identity, by *modus operandi,* the prior bad act must have been so strikingly similar to the present act as to constitute a "signature crime." *Rearick v. Commonwealth,* 858 S.W.2d 185, 187 (Ky.1993). Of course, as noted in *Campbell,* "strikingly similar" does not necessarily mean "identical." *Campbell,* 538 U.S. at 423–24, 123 S.Ct. at 1523–24.

▇▇ We admit evidence of a prior bad act under KRE 404(b) only if the evidence satisfies the three-part test of *Bell v. Commonwealth,* 875 S.W.2d 882 (Ky.1994), *viz:*

(1) Is it relevant? (2) Does it have probative value? (3) Is its probative value sub-, stantially outweighed by its prejudicial effect? *Id.* at 889–91. The probativeness prong of this test relates to whether there is sufficient evidence that the other crime, wrong, or act actually occurred. *Id.* at 890; Lawson, *supra,* § 2.25[3][c], at 130–31. Since Raines did not file a "bad faith". action against Farm Bureau, and there was no evidence of the nature and extent of her injuries, her evidence was not probative that Farm Bureau acted in bad faith with respect to her claim.

In *Kentucky Farm Bureau Mutual Insurance Co. v. Troxell,* 959 S.W.2d 82 (Ky. 1997), we approved evidence of the mishandling of a prior claim in a bad faith action because it arose out of conduct by the same claims adjuster involved in the claim at issue; thus the insurer/employer was on notice of "a pattern of conduct practiced by its agent." *Id.* at 85–86. We also held that "any monetary amounts involved in the prior litigation are not rele-' vant and should not be introduced ...." *Id.* at 86. Here, the Raines case did 'not involve the same adjuster and did not result in a bad faith claim that might have put Farm Bureau on notice of a pattern of conduct practiced by one of its agents. Further, Rodgers was permitted to introduce evidence of the judgment Raines re-covered· in her case in direct contravention of the holding in *Troxell.* (*Troxell* became final on February 19, 1998. The case *sub judice* was tried in October and November 2000.)

The evidence does not show that Farm Bureau's handling of Raines's case "replicates" its handling of Rodgers's case. Farm Bureau was the primary insurer in Raines's case and only the secondary insurer in Rodgers's case. It is impossible to compare claims evaluations made in those respective cases because there was no evidence of the nature of Raines's injuries. Moreover, the mere comparison of settlement offers to ultimate verdicts false-ly assumes that all juries treat similar cases the same.

■ However, Paul Hibberd's testimony about the Raines case was elicited on cross-examination, and some of that testi-mony was admissible for the purpose of impeaching his direct testimony. As noted *supra,* Rodgers's attorney, McClelland, sent Farm Bureau a letter on June 22, 1998, demanding that it pay the policy limits of its UIM coverage. The demand letter did not set forth the basis for this evaluation, and Hibberd testified on direct examination that a proper demand letter should set forth the nature and extent of the client's injuries and contain supporting documentation such as copies of medical bills and medical reports.

Hibberd testified:

A demand letter is a· communication ·from the attorney for the injured person ... setting out the reasons that the plaintiff is entitled to compensation for their [sic] injury. It includes a wide variety of things, depending upon the type of ... incident that· caused the injury and the·type of injury. But it is a communication to familiarize the insur-ance company with all the different as-pects of the incident and ·the injury and then· to tie it all together to say, on behalf of the plaintiff, we demand the sum of X number of dollars as compen-sation for this injury.

Thus, the crux of Hibberd's direct testimo-ny was his expert opinion that McClelland had deviated from standard practice by making a demand that was unsupported by sufficient documentation to permit Farm Bureau to properly evaluate the claim. The purpose of this evidence was to attrib-ute any appearance of bad faith in the form of delay and a low settlement offer to

McClelland's failure to follow what Hibberd opined was "standard practice." (Of course, since Farm Bureau was also Rodgers's BRB insurer, it already had most of the information Hibberd claimed it needed and, in fact, had furnished it to McClelland for use in support of Rodgers's liability claim against Omni.)

On cross-examination, Rodgers elicited from Hibberd that he had represented Raines in her liability claim against Farm Bureau, that he had furnished Farm Bureau with a properly documented letter demanding payment of its policy limits, and that Farm Bureau did not offer its policy limits until the second day of Raines's trial. This testimony was admissible to impeach the implication arising from Hibberd's direct examination that a properly documented demand letter would have resulted in a more prompt and favorable settlement offer. The evidence was relevant as "facts tending to disprove a defense," *Tuttle v. Perry*, 82 S.W.3d 920, 922 (Ky.2002), and "[a]ll relevant evidence is admissible, except as otherwise provided ...." KRE 402.

■ Nevertheless, the mere fact that this testimony was relevant for another purpose does not remove it from the purview of *Campbell* or KRE 404(b). The Raines evidence that tended to show the ineffectiveness of Hibberd's "proper demand letter" was not admissible for the purpose of proving Farm Bureau's bad faith in this case by showing that it had acted in bad faith in another case. Rather, the evidence was admissible only to impeach the credibility of Hibberd's expert opinion about the efficacy of detailed demand letters in aiding insurance companies to process claims in a more timely and fair manner. Such impeachment testimony is not proscribed by *Campbell* or KRE 404(b). "The credibility of a witness' relevant testimony is always at issue, and the

trial court may not exclude evidence that impeaches credibility even though such testimony would be inadmissible to prove a substantive issue in the case." *Sanborn v. Commonwealth*, 754 S.W.2d 534, 545 (Ky. 1988). Professor Lawson echoed this sentiment when he noted that "[a] wide array of evidence is admissible only because it renders testimonial credibility more probable or less probable than it would without the evidence." Lawson, *supra*, § 5.05[3], at 82. However, since the Raines evidence was admissible only for this limited purpose and was inadmissible for the purpose of obtaining punitive damages or proving action by Farm Bureau in conformity with other wrongful acts, an admonition, if requested, should be given if the same evidence is offered for impeachment purposes upon retrial.

Accordingly, we reverse the Court of Appeals and remand this case to the Lincoln Circuit Court for a new trial in conformance with the content of this opinion.

·COOPER, GRAVES, JOHNSTONE, and ROACH, JJ., concur.

LAMBERT, C.J., dissents by separate opinion, with SCOTT, and WINTERSHEIMER, JJ., joining that dissenting opinion.

WINTERSHEIMER, J., dissents by separate opinion, with LAMBERT, C.J., and SCOTT, J., joining that dissenting opinion.

Dissenting opinion by Chief Justice LAMBERT.

I respectfully dissent. I am in agreement with Justice Wintersheimer's view that neither *Campbell* nor KRE 404(b) prohibited Raines' testimony from being admitted. The trial court determined that the Raines testimony was admissible and "the standard of review is whether there has been an abuse of discretion. The test

for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[1] Thus, trial courts possess broad discretion with respect to the admission or exclusion of evidence, and appellate courts are at liberty to reverse only upon a showing of abuse.[2] Accordingly, when a jump-ball occurs, the arrow always points to the trial judge, but we have departed from that principle here.

The majority admits that the Hibberd testimony is admissible for purposes of impeachment, but no other. However, since it came in for impeachment purposes, it should have also been received substantively. While this is not a *Jett v. Commonwealth*[3] case, it is closely analogous. If Hibberd had made an out-of-court statement that differed from his testimony in court, *Jett* would permit the impeachment of Hibberd on this basis, and the impeaching evidence could be used for substantive purposes. Accordingly, Hibberd's testimony concerning the Raines' case should have been admitted as both impeachment and substantive evidence.

SCOTT and WINTERSHEIMER, JJ., join this dissenting opinion.

Dissenting opinion by Justice WINTERSHEIMER.

I must respectfully dissent from the majority opinion because the admission of testimony regarding bad faith on the part of the insurance company was not error.

It is regrettable that the majority opinion seeks to avoid the obvious concern about punitive damages which, in my judgment, was the major reason to accept this case for discretionary review. The majority opinion seeks to obviate the need to discuss whether punitive damages awarded here violate the due process clause of the Fifth and Fourteenth Amendments of the U.S. Constitution as interpreted in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). I believe we must fully discuss the implications of punitive damages in this case. I will do so in Section II of this dissenting opinion.

Although this case has lingered long in the legal system, the matter should not be remanded without some direction to the Circuit Court as to the question of punitive damages.

In order to have a complete picture, it is necessary to review all the facts.

Johnson was injured on October 26, 1997, when her automobile was hit from the rear by a drunk driver. Johnson suffered injuries to her neck and back and required surgeries for a torn rotator cuff and thumb. Her vehicle was a total loss. Johnson's policy of insurance with Farm Bureau had limits of $10,000 for basic reparation benefits and $50,000 for underinsured motorist coverage. The driver of the other vehicle had a minimum liability policy with Omni Insurance. Johnson was paid $25,000 by that company.

Johnson submitted an application which included a medical authorization form for her no-fault coverage, including Personal Injury Protection (PIP) benefits and Farm Bureau began paying her medical bills which had resulted from the collision. Johnson learned that she was also entitled to collect PIP wage-loss benefits. She

---

1. *Commonwealth v. English*, 993 S.W.2d 941, 945 (1999) (citing *Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky.1996); 5 Am.Jur.2d Appellate Review § 695 (1995); cf. *Kuprion v. Fitzgerald*, 888 S.W.2d 679, 684 (Ky.1994)).

2. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575 (Ky.2000).

3. 436 S.W.2d 788 (Ky.1969).

made an appropriate inquiry of the insurance company, and only then did they begin to remit those payments.

The record indicates that medical records were regularly forwarded to Farm Bureau by Johnson's medical providers. These records reflected her extensive treatment, her several surgeries, and her time away from work for pain and/or recovery. The reports showed that as early as March 30, 1998, she had sustained permanent injury as a result of the accident. All of this information was transmitted to Farm Bureau as a courtesy and not as a result of any effort undertaken by the insurer to investigate or evaluate the claim.

On March 31, 1998, Johnson became aware that an upcoming surgery on her shoulder would exhaust her PIP benefits. Shortly thereafter, her attorney advised Farm Bureau in writing of her underinsured motorist claim and noted that her injuries and damages would far exceed the $25,000 coverage limits of the other motorist. On June 22, 1998, counsel for Johnson sent a written demand for $50,000 for underinsured motorist coverage to Farm Bureau. It responded by establishing a reserve account of $15,000.

Attempts to settle the claim were initiated by counsel for Johnson to no avail. He telephoned the company on August 3, 1998 to ask whether the company intended to pay any benefits under the policy. The call was not answered by the adjuster, but rather by the adjuster's claim supervisor, Terry Lester, who advised that he was taking over the file. He denied the claim against UIM coverage totally. Before the telephone call was concluded, the attorney for Johnson threatened the company with litigation. In response, the claim supervisor indicated that "if it will help you any, I can probably get you $10,000." Johnson rejected the offer and filed suit for the UIM benefits and a claim for bad faith. Farm Bureau never increased its settlement offer.

A bifurcated trial was held and Johnson's direct action against her insurance company resulted in a jury award of $98,618 for medical expenses, lost wages and future impairment. At her bad faith trial, she recovered $30,000 for mental and emotional suffering, $16,666 in attorneys' fees and expenses of $2,704. Interest accrued and paid amounted to about $1,533. The jury also awarded one million dollars in punitive damages. On appeal, the Court of Appeals unanimously upheld the verdict. This Court accepted discretionary review.

## I. The Raines Testimony

Farm Bureau challenges the admission of the testimony of Mabel Raines regarding her unrelated third-party claim against a Farm Bureau insured. The Raines testimony was that Farm Bureau initially offered her $14,000 to settle her personal injury claim and that the company offered to settle the claim for the $100,000 policy limits only after the case had been presented to the jury. She testified that the jury awarded her more than $200,000. Farm Bureau argues that neither KRE 404(b) nor *Kentucky Farm Bureau Mut. Ins. Co. v. Troxell*, Ky., 959 S.W.2d 82 (1997), permits the introduction of such testimony. It contests that Raines had a different adjuster and dissimilar litigation. Farm Bureau uses *Campbell, supra,* as authority that evidence of similar acts ought not to be admitted here.

We agree with Johnson that the testimony by Raines was primarily used to rebut the assertion that Farm Bureau's handling was an innocent mistake. She distinguishes *Campbell* to the effect that it did not involve 404(b), but was a case about the proper scope of punitive damages, and

it did not address a third-party claim. Johnson contends that in this case the testimony was used to establish bad faith for the elements of the claim and that this case had the same adjuster. She also notes that *Campbell* prohibited such evidence for a Utah case, but Utah treats third-party and first-party suits differently, *see Cannon v. Travelers Indemnity Co.*, 994 P.2d 824 (Utah Ct.App.2000), whereas the Kentucky Unfair Claims Settlement Act considers and evaluates the first and third-party claims similarly. We find Johnson's position to be persuasive.

The majority opinion's analysis of *Troxell* is flawed. The majority attempts to ignore the fact that *Troxell* recognizes that evidence of similar prior litigation involving the insurer and the adjuster was relevant to show the awareness of the insurer of the pattern of unacceptable claim handling methods by the adjuster. Thus, the evidence of that awareness is admissible in a suit by the insured against the insurer for punitive damages for bad faith and unfair claims settlement practices. KRS 411.184(3).

KRE 404(b) prohibits the admission of evidence of other crimes, wrongs or acts for the purpose of proving the character of a person or, in this case, a corporation, in order to show action in conformity therewith on particular occasions. The rule provides that such evidence may be admissible if offered for some other purpose such as proof of intent, knowledge or absence of mistake or accident. KRE 404(b)(1). In a bad faith case, it is proper for a jury to consider other insurance claims. *Troxell, supra,* held that evidence introduced by the plaintiff pertaining to similar litigation and involving a particular adjuster was relevant and admissible in a bad faith trial. This Court noted that the plaintiff's evidence had been offered to prove that Farm Bureau was aware that the adjuster had previously used methods contrary to good-faith claim handling practices and that the insurance company had knowledge of and had acquiesced in the pattern of conduct of its agent.

The factual situations presented by Raines and Johnson are similar. The two adjusters, Richard Smith and Terry Lester, served in both cases. Both Raines and Johnson were unmarried middle-aged women who worked in jobs requiring physical labor. Both had similar medical expenses. Farm Bureau employed the same defense attorney in each case and both cases were tried in Lincoln County. Raines and Johnson were initially offered only 14 percent and 16 percent of the actual value of their claim which was in line with what the insurer's training manual instructed. Both women were strained financially by their accidents and the evidence shows that Farm Bureau knew it.

In this case, the evidence was relevant and admissible to demonstrate that Farm Bureau was aware of the pattern and conduct of its adjusters to fail to evaluate claims fairly. The evidence was also relevant to show the absence of mistake. Farm Bureau attempted to explain its behavior by admitting that hindsight revealed that it had innocently misevaluated the claim by Johnson. The similar misevaluation evidence was presented to discredit the Farm Bureau claim of hindsight and to support the contention by Johnson that the failure to adjust her claim properly was intentional so as to deceive her.

The contested testimony was also relevant to establish the necessary factors to be considered by the jury as to whether punitive damages should be awarded. Certainly, a plaintiff must have evidence to permit submitting a claim for punitive damages. *See Wittmer v. Jones,* Ky., 864 S.W.2d 885 (1993). In determining the amount of punitive damages, KRS

411.186(2)(c) and (d) provides that a jury should consider certain factors, including both the "profitability" and the "duration" of the misconduct. The statute also permits a jury to consider what actions, if any, were undertaken by a defendant to remedy the misconduct. The testimony presented demonstrated other instances of similar behavior that Farm Bureau did not merely inadvertently fail to settle the Johnson claim properly, but that it had done so intentionally, conduct resulting in a highly profitable business incentive. The testimony also shows the duration of the ongoing unfair claims settlement practices.

Citing *Troxell,* Farm Bureau complains that Raines was improperly allowed to testify concerning the amounts of her claim. At an in chambers conference before trial, Farm Bureau objected to Raines's testimony on two specific grounds: 1) That Terry Lester was only slightly involved in Raines' case and 2) Raines' suit did not involve a bad faith claim against Kentucky Farm Bureau. The trial judge correctly overruled the objection and permitted Raines to testify.

We agree with the decision of the trial judge to overrule the objection made at trial. The argument now asserted by the insurance company, that Raines should not have been allowed to testify to amounts, is not properly preserved for appellate review because no objection was ever offered at trial on this ground. KRE 103(a). Although decided prior to the adoption of the Kentucky Rules of Evidence, we find support in the case of *Nunn v. Slemmons' Adm'r,* Ky., 298 Ky. 315, 182 S.W.2d 888 (1944), which indicates that when a witness is competent as to some matters and incompetent as to others, an objection must be made on matters in which she is incompetent. Farm Bureau's objection to the relevance of Raines' testimony on two spe-

cific grounds did not relieve it of the obligation to also object to Raines' testimony regarding the amounts. The trial judge did not err in allowing Raines to testify.

## II. Punitive Damages

In this case we find another Kentucky approach to the directives of the United States Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In that case, the United States Supreme Court properly promulgated a flexible general standard to be applied to each particular case as the facts required. As ably expressed by Judge Richard Posner in *Mathias v. Accor Economy Lodging, Inc.,* 347 F.3d 672 (7th Cir.2003), the U.S. Supreme Court did not fix any set ratios. It did not provide a 4 to 1 or single digit rule, but merely stated that there is a presumption against an award that has a 145 to 1 ratio. As Judge Posner eloquently pointed out, "... there are no punitive damages guidelines. It is inevitable that the specific amount of punitive damages awarded, whether by a judge or a jury, will be arbitrary .... The judicial function is to police a range, not a point." *Mathias* at 678.

Under any analysis, the ratio plan suggested by State Farm is not exceeded and it can be reasonably argued that the punitive damages in this case are within any acceptable guideline. True reconsideration, by definition, does not necessarily mean automatic change. All courts should be careful to avoid overreaction and dangerous overcorrection without any significant logical or legal foundation.

In *Mathias,* Judge Posner, writing for the unanimous panel, clearly held that damages had at one end of the spectrum the contract and economic, while at the other end of the spectrum were the dignitary torts such as battery. Judge Posner

gave an example of the recovery allowed for a battery committed by spitting in another's face. In such cases, the compensatory damages must be nominal because there is no way to represent actual damages adequately. Therefore, and among other reasons, the court concludes that applying a ratio to such cases is meaningless. Because the plaintiff in that case had suffered personal injuries caused by being bitten by bed bugs, Judge Posner likened their damages more to having been spit in the face than to damages caused by breach of contract.

Even though the plaintiffs had actual damages represented by medical bills, that court determined that there is more purpose behind the punitive damages than merely magnifying actual costs. Adequate deterrence of the activity and of vigorous litigation as well as making it economically feasible to litigate such cases were among the reasons stated for upholding the entire punitive damage award. Consequently, that court upheld the punitive damages awarded without regard to the ratio between compensatory and punitive.

Using the factors in *Campbell*, the company states that its reprehensibility was low and does not merit punishment because of a delay in payment; that the ratio between the compensatory and punitive damage is unconstitutionally high and that this punishment has great disparity from the civil penalties authorized in comparable cases.

*Campbell* is an action in which the insureds brought suit against an automobile liability insurer to recover for bad faith failure to settle within policy limits, fraud and intentional infliction of emotional distress. The U.S. Supreme Court held that the award of $145 million in punitive damages on a one million dollar compensatory judgment was excessive and violated due process.

Punitive damages may be properly imposed to further the legitimate interest of a state in punishing unlawful conduct and in deterring its repetition. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The decision to punish a tortfeasor by imposing exemplary damages must comply with the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), states that the Due Process Clause of the Federal Constitution prevents the states from imposing grossly excessive punishment on tortfeasors. That case also requires that a *de novo* review by an appellate court must be made of the amount and nature of punitive damages. *Cf. Sand Hill Energy, Inc. v. Ford Motor Co.*, Ky., 83 S.W.3d 483 (2002), *cert. granted, judgment vacated by Ford Motor Co. v. Smith*, 538 U.S. 1028, 123 S.Ct. 2072, 155 L.Ed.2d 1056 (2003).

The *BMW* court describes the degree of reprehensibility as "Perhaps the most important indicium of the reasonableness of a punitive damages award." *BMW*, 517 U.S. at 575, 116 S.Ct. 1589. *Accord Cooper Industries, Inc., supra; Campbell*. Johnson had been a Farm Bureau policyholder for seventeen years. In its advertising and other communications with their policyholder, the insurance company endeavored to assure that UIM coverage would prevent her from suffering financially if she were ever injured by an irresponsible or financially underinsured motorist and that Farm Bureau would help her to recover from any loss as quickly as possible because "helping you is what we do best."

The evidence in this case indicates that in contrast to these pleasant reassurances,

such were deceptive representations because Kentucky Farm Bureau trained its adjusters to exploit financially weak claimants. The adjuster's training manual encouraged the adjusters to plant uncertainty in the minds of claimants; to "seize upon" any fear, anxiety and money needs for settlement purposes; to overreach and take advantage of the delays occasioned by litigation; and to cause intimidation by the fact that Farm Bureau had a stronger base of power in any claim because it controlled the money.

Here, Farm Bureau was in the position to evaluate its insured's dwindling financial resources and her growing financial hardship because it was obligated to remit PIP benefits. When her physician advised her not to return to work, Johnson responded, "Well, it's like this, I've either got to go back to work or starve to death . . . ." The company knew that she was vulnerable and to what degree.

The behavior of Farm Bureau is an example of the conduct defined as a basis for the award of punitive damages. The "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct . . . or when the target is financially vulnerable, can warrant a substantial penalty." *BMW*, 517 U.S. at 576, 116 S.Ct. 1589. Multiple violations are considered even more reprehensible. *Id.* The jury verdict clearly demonstrates that the company failed and refused to communicate with her properly; to investigate and evaluate her claim reasonably and to attempt in good faith to reach a fair settlement. There is sufficient evidence in the record with respect to the seriousness of the misconduct of Farm Bureau to support the award of punitive damages under the first standard set out in *BMW*.

Another criterion which is important in reaching a decision in review of these cases requires the court to balance the amount of the award against the degree of harm suffered. We must consider the ratio between the size of the punitive damage award and the harm "or potential harm" that was or could have been caused by the misconduct of the insurer. As noted in *Campbell*, there is no clear mathematical formula to be applied in considering any particular ratio. In an appropriate case, a higher ratio will be suitable where aggravating factors are involved.

Here, the harm to Johnson was significant. She also argues that we must consider the potential harm she might have suffered if Farm Bureau had succeeded in its scheme. She contends that if she had failed to resist the bad faith efforts of the insurance company to settle her claim, she would have suffered an additional loss of more than $40,000. The jury determined that she suffered nearly $50,000 in actual damages. The potential harm, the difference between the offer and the ultimate policy limit recovered, was $40,000. Consequently, the ratio between the harm, or potential harm, to the plaintiff and the punitive damages awarded is approximately 11 to 1. Under all the circumstances, after an independent review, I am satisfied that there is sufficient evidence in the record with respect to the actual harm and the potential harm caused by the misconduct of Farm Bureau to support the punitive damages awarded.

Another important element to be considered is the difference between the punitive damages awarded and the civil penalties in similar cases. Farm Bureau claims that the statutory penalties for misconduct of the type in question here do not authorize the jury award, and it also maintains that previous jury verdicts do not provide an adequate warning of the size of such a monetary penalty. I am not convinced.

The Unfair Claims Settlement Practices Act was first adopted in 1984. In addition,

there is a Commissioner of Insurance who enforces the provisions of the Act and there are various administrative regulations regarding unfair claims settlement practices. This Court has recognized a private cause of action for damages arising from a violation of these provisions. *See State Farm Mut. Auto. Ins. Co. v. Reeder,* Ky., 763 S.W.2d 116 (1988). It is hard to imagine that Kentucky Farm Bureau is unaware that there are substantial civil penalties when unfair claims settlement practices are involved. A company's license to sell insurance may even be jeopardized by suspension or revocation for engaging in this kind of misconduct. It must also be aware that the Constitution of Kentucky does not impose any kind of limit on the imposition of punitive damages. The argument of inadequate notice of the potentially severe consequences of misconduct is without merit.

As it stands now, the ratio imposed is roughly 11 to 1. This ratio may seem high to some, however, the degree of reprehensibility and the pattern of bad faith does support the ratio imposed as reasonable. *Campbell* provides additional guidance to state courts in determining the propriety of the imposition of punitive damages. In essence, *Campbell* states that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishment on a tortfeasor, and to the extent an award of punitive damages is grossly excessive, it does not further any legitimate purpose and constitutes arbitrary deprivation of property. In *Campbell,* the punitive damage award of the jury was $145 million for a bad faith failure to settle for the policy limits where the compensatory damages were one million dollars. As stated earlier in this case, Johnson was awarded $98,618 for medical expenses etc.; $30,000 for mental and emotional suffering; $2,704 for expenses; $16,666 in attorney fees; $1,533 in interest accrued and paid; and one million dollars in punitive damages.

Through independent review of this case, when measured against the standards of *Campbell,* the punitive damages were not grossly excessive. A careful appellate review indicates that the punitive damages were based on the proper application of the law and not on what can be called a decision-maker's caprice, nor were they an arbitrary deprivation of property.

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell,* citing *BMW,* 517 U.S. at 575, 116 S.Ct. 1589. *Campbell* instructs courts "to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell,* 538 U.S. at 419, 123 S.Ct. 1513 citing *BMW,* 517 U.S. at 576–577, 116 S.Ct. 1589.

Here, we are faced with a mixed question with both physical and economic damages. The actions of the company were taken with disregard to the health of the target, who was also financially vulnerable. This reprehensible activity was shown to be repeated conduct and inferred to be with intentional malice. All of the factors of reprehensibility weigh against Kentucky Farm Bureau and, therefore, a significant award is warranted.

Kentucky Farm Bureau argues that the Court of Appeals relied on the fact that the Kentucky Farm Bureau license to sell insurance may even be jeopardized by sus-

pension or revocation for engaging in this sort of misconduct. The company contends that speculation about the loss of a business license, according to Campbell, is an insufficient analysis of the third *BMW* guidepost. In reviewing this matter it is necessary to consider a larger context of the *Campbell* opinion. The third guidepost in *BMW* is the disparity between the punitive damage award, and the "civil penalties authorized or imposed in comparable cases." *Id.,* at 575, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809. In the past, we have also looked to criminal penalties that could be imposed. *Id.* at 583, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809; *Haslip,* 499 U.S. at 23, 111 S.Ct. 1032., 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1. The existence of a criminal penalty does not bear on the seriousness with which a state views the wrongful action. When used to determine the dollar amount of the award, the criminal penalty has less utility. Great care must be taken to avoid the use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standard of proof. Punitive damages are not a substitute for the criminal process and the remote possibility of a criminal sanction does not automatically sustain a punitive damage award.

In *Campbell,* the most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, an amount dwarfed by the $145 million punitive damage award. *See* 65 P.3d at 1154. The Supreme Court of Utah speculated about the loss of the business license of State Farm, the disgorgement of profits and possible imprisonment, but here again, its references were to the broader fraudulent schemes of out-of-state and dissimilar conduct. It is readily apparent why this approach was insufficient to justify the award in that case.

My analysis clearly differs from the majority in that the U.S. Supreme Court indicated that it was concerned about such speculation based solely upon "out of state and dissimilar conduct." This is not the case here. Kentucky law allows the Department of Insurance to revoke a license to do business for violations of the UCSPA statute.

In addition to revoking or suspending the license of an insurer, or in lieu thereof, the Commissioner of Insurance may impose a civil penalty against the insurer for up to $10,000 per violation. KRS 304.99–020. A fine of twice the amount of the gain from the commission of the violations is also possible. KRS 304.99–010. In this case, the civil penalties for the six violations found by the jury could amount to $60,000. The fines could be twice the gain, or $80,000. Considering the possibility of a license suspension and a potential fine of $140,000, the punitive damages awarded by the jury are well within the range of reasonableness. As the Court of Appeals recognized, there have been a number of judicial decisions where punitive damage awards comparable to this one have been sustained. *Campbell* does not indicate that "judicial decisions" are not to be considered in analyzing the third *BMW* guideline. It is interesting to note that in *Phelps v. Louisville Water Company,* Ky., 103 S.W.3d 46 (2003), this Court acknowledged the propriety of considering "judicial decisions" in this context when it stated in part that "LWC was well aware of the possible ramifications of the negligence of its employees, as it has been subject to numerous civil actions for personal injury and property damage over the years."

It must be remembered that the *Campbell* court noted that a punitive damage award at or near the amount of compensa-

tory damages, which in that case was one million dollars, or 100 times the most relevant civil action available in Utah which was a $10,000 fine. By comparison, the amount of the punitive damages awarded in this case does not exceed the suggested guidelines mentioned in *Campbell.*

The misconduct of Kentucky Farm Bureau in this case has been noted in great detail to a great degree in earlier paragraphs. My review indicates that the conduct in question does in fact replicate the prior transgressions by this defendant who is certainly not a first offender. Although *Campbell* does not impose an exact mathematical formula, the situation presented in this case does not exceed what is suggested as the proper determination of an award that exceeds a single digit ratio between punitive and compensatory damages. Even in that regard, the United States Supreme Court is flexible in stating that such a ratio may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. Here, the punitive award is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages awarded. Considering this case as a whole, the behavior of Kentucky Farm Bureau is so reprehensible that it does require the imposition of significant punitive sanctions in order to achieve deterrence from continued behavior of this nature.

LAMBERT, C.J., and SCOTT, J., join this dissenting opinion.