# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: DECEMBER 14, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0285-MR

ROBERT L. JOHNSON                                            APPELLANT

V.

ON APPEAL FROM BRECKINRIDGE CIRCUIT COURT
HONORABLE KENNETH H. GOFF, II, JUDGE
NO. 20-CR-00170

COMMONWEALTH OF KENTUCKY                           APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Robert L. Johnson was convicted of one count of first-degree manslaughter and one count of second-degree manslaughter and sentenced to a total of thirty years based on the recommendation of the jury. Johnson's convictions stem from the deaths of two individuals that Johnson repeatedly shot during a meeting to sell ecstasy pills.

Johnson appeals as a matter of right and alleges trial errors relating to a detective testifying about items missing from the victims' residence and offering his opinion that Johnson had robbed the victims when Johnson was not charged with theft, and the trial court limiting the testimony of Johnson's expert. Finding no error, we affirm Johnson's conviction and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the night of August 5, 2020, a 911 call was received by Breckinridge County dispatch from a female identifying herself as "Libby" who reported she was in a black Volkswagen Jetta outside a trailer residence in Garfield, Kentucky and heard gunshots being fired. She also reported that her boyfriend, who she identified as "Montez Johnson," was inside the residence. Officers from several forces responded to the call and found no Jetta and no one outside the trailer. Upon entering the trailer, officers discovered two deceased males with apparent gunshot wounds. One of the victims, later identified as Jacob Loeffler, was slumped to the side of a sofa. The other victim, Steven Gann, was face-down to the left of the entrance to the trailer under a window.

Loeffler was shot four times. One bullet wound was to the forehead, another to the right side of his head entering his cheek, another through and behind his right ear, and the last to the right side of his head above and behind his ear. Gann had been shot in his left shoulder, twice in the back, and three times in the head. Two of Gann's head wounds were to the back of his head just above his neck. Postmortem urine screens for both victims showed positive results for amphetamine and methamphetamine.

Officers contacted emergency medical services, secured the premises, and obtained search warrants for the residence and a GMC Envoy parked in the driveway. Evidence collected included photographs, physical evidence, a 3D scan of the trailer, and drone photography. During the execution of the search warrants, the officers found pills, suspected methamphetamine, a digital scale,

and numerous items used in conjunction with firearms, including a pistol magazine, cleaning equipment, a case for a Sig Sauer pistol, numerous 9mm shell casings and an unfired bullet of the same caliber.

Working from the information supplied by Libby's phone during the 911 call, dispatchers were able to "ping" the caller's phone to a location in the south end of Louisville and identify the caller as Elisabeth Fritz. Officers were able to locate her and the Jetta the next day at an apartment complex in Louisville, Kentucky. A search of the Jetta resulted in finding cash wedged between the seat and the console and a bag in the trunk which contained Gann's prescription bottles.

The police brought Fritz in for questioning. Fritz explained that Johnson had arranged to sell drugs ("ecstasy" or "X") to people at the location in Breckinridge County and that she believed he was taking 100 pills which would result in a sale price between $500 and $1500 dollars. She further stated that when they arrived, she saw a white male exit the trailer and meet Johnson outside where they spoke briefly before entering the trailer together. After an hour or so of waiting in the car, she heard gunshots coming from inside the trailer. She feared the worst and called 911 before her own phone died.

Officers executed an arrest warrant for "Montez Johnson," the name they had for Robert Johnson, and he was taken into custody. Johnson tested positive for gunshot residue.

3

Search warrants were also obtained for Loeffler's and Gann's cell phone records and Facebook accounts. Loeffler's records confirmed that he had been in contact with Johnson via a third-party regarding purchasing ecstasy.

Johnson was indicted on two counts of murder. His trial began on May 31, 2022.

Johnson testified that the deaths of Loeffler and Gann were the result of him acting in self-defense. He acknowledged that he dealt in pills such as ecstasy and had been put in touch with Loeffler or Gann by an associate with whom he had conducted prior drug transactions. He denied meeting either victim prior to the incident and explained he had not been to Breckinridge County before. Johnson arranged to sell Loeffler 100 ecstasy pills and drove to meet him in Fritz's vehicle. Upon arriving, Johnson called Loeffler expecting Loeffler to come to the car. However, Loeffler motioned for Johnson to come inside. Johnson claimed he was hesitant because he was not armed and testified that he didn't bring a firearm because he didn't want to get pulled over with "dope, the money I already had on me, and a weapon."

According to Johnson, he sat down on the sofa and counted the pills out "three or four times" to Loeffler, but instead of paying Johnson, Loeffler showed him YouTube videos on the television for "45 to 50 minutes." Johnson saw a Sig Sauer pistol on the coffee table and another pistol on the arm of the couch. He later saw Gann coming through the hall doorway armed with a Glock. Gann took a seat on a loveseat to the right of Johnson but did not put his pistol away.

4

According to Johnson, when he stood up and took his pills, Loeffler stood up with the Sig Sauer and put it in his face, telling him to empty his pockets and to take off his shoes. At this time, Gann was between Johnson and the door looking out the window at the vehicle where Fritz was seated. Johnson testified that he decided to "call [Loeffler's] bluff" and refused his demands. When Gann took another step towards the window by the door, Johnson grabbed the pistol Loeffler was holding and fired "three to five" shots directly into Loeffler. Gann then turned back from the window, and Johnson shot him "until the gun clicked", meaning it had been emptied.

Johnson testified that he grabbed a bag that was on the floor, threw the gun (the pistol he used to shoot Loeffler and Gann) into it, ran back to the Jetta and drove back to Louisville. Johnson explained that while driving back to Louisville, he threw the ecstasy pills and two of his three phones out of the car window. He then stopped in Jefferson Memorial Forest where he threw the bag containing the pistol into the lake there. Attempts made to recover those items from the lake were unsuccessful.

## II. ANALYSIS

**A.  Did the trial court abuse its discretion by allowing a detective to testify regarding items missing from the scene and that it was his opinion that the motive for the murders was robbery? - Preserved.**

For his first argument, Johnson asserts that the trial court abused its discretion by allowing Detective Cook to testify about items that were possibly missing and taken from the trailer where the shooting occurred, and his belief that the motive for the killings was robbery.

5

The Commonwealth argues that Johnson argues on appeal that Cook's testimony violated Kentucky Rules of Evidence (KRE) 404(b), but that defense counsel never made such an argument during trial. *See Springer v. Commonwealth,* 998 S.W.2d 439, 446 (Ky. 1999) ("A new theory of error cannot be raised for the first time on appeal." (citing Kentucky Rules of Criminal Procedure (RCr) 9.22)). Johnson in turn claims that this issue was preserved by one oral motion preceding any witness being called and one non-specific objection made during testimony.

Before the first witness testified, defense counsel approached the bench and made a motion for the judge to prohibit any insinuation that Johnson took anything from the crime scene, as he was never charged with theft. The Commonwealth objected to the motion, stating that the Jury was "entitled to draw its own conclusions." The trial court overruled Johnson's motion without any more discussion.

During the trial, Cook testified that a list was found near Loeffler's body. He referred to this list as "the inventory" and it appeared to give the hiding places in the trailer for various items suspected to be drugs and stashes of cash. During trial, the jurors were also shown pictures of the locations listed in the inventory. These photos showed that the hiding places were empty, and the items were missing. Cook testified that there was a gun case and ammunition in the trailer but no firearms. He testified that there were controllers for a gaming system but no gaming console and testified that the victims' bodies had their pants pulled down and their pockets turned out and that one victim had

6

a holster strapped to his waist with no pistol in it. Additionally, Cook testified to finding slashed sofa cushions; he theorized Johnson was trying to find hidden items. Cook testified that a search of Loeffler's phone showed him "fanning" a large amount of currency.

Johnson's counsel did not make a contemporaneous objection to such hearsay. Later, the following exchange occurred:

Commonwealth: Any idea why he murdered them?

Johnson's Counsel: Objection, your Honor.

Commonwealth: Can he give an opinion as to why he thinks? – what the motivation is behind the murders?

Trial Court: Um, I'll overrule, go ahead.

Detective: I believe, ah, I believe they were murdered, and things were taken out of their house, and I think there you have the facts . . .

Commonwealth: [Interjecting] All the guns were gone, correct?

Detective: Yes.

Commonwealth: All the money is gone. Correct?

Detective: Yes.

Commonwealth: All the drugs are gone. Correct?

Detective: Yes.

Commonwealth: I have no more questions, Judge.

Trial Court: Very well.

We must first address the issue of whether or not this argument was properly preserved. Johnson's counsel objected to these general areas of inquiry prior to Cook taking the stand, and we will accept this appellate

argument as being preserved and will review the issue of the detective's testimony on an abuse of discretion standard, rather than the palpable error advocated by the Commonwealth and will determine whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principals." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

**KRE 404(b)**

Robbery or theft would be evidence of another crime, generally prohibited by KRE 404(b), but KRE 404(b)(1) allows for the admission of evidence regarding other crimes, "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]"

To determine the admissibility of prior bad act evidence, we have adopted the three-prong test described in *Bell v. Commonwealth*, 875 S.W.2d 882, 889–891 (Ky. 1994), which evaluates the proposed evidence in terms of: (1) relevance, (2) probativeness, and (3) its prejudicial effect.

KRE 404(b) would be applicable if the evidence of potential thefts were introduced with the intention of showing that Johnson was acting in conformity with his character to commit one bad action (robbery) when the charged bad act (murder) occurred (*i.e.*, "prove the character of a person in order to show action in conformity therewith"). *Kentucky Farm Bureau Mut. Ins. Co. v. Rogers*, 179 S.W.3d 815, 819 (Ky. 2005).

The Commonwealth was not offering testimony of robbery to show Johnson was predisposed to murder or that he had committed robbery and/or

8

murder before. The circumstantial evidence offered that items were missing from the residence after Johnson shot the victims went more so to his potential "motive, opportunity, intent, preparation, [or] plan" under KRE 404(b)(1). The evidence also served to potentially counter his assertion that he only repeatedly shot the victims in an act of self-defense. Lastly, the evidence was of such a nature as to be "inextricably intertwined with other evidence essential to the case." KRE 404(b)(2). Excluding all mention of potentially missing items would eliminate not only evidence of items on the list the detective found, but also exclude the pistol Johnson admitted he had taken from the residence, Gann's prescription medications found in the trunk of Fritz's car, and basic crime scene evidence that the victims were found dead with their pockets turned inside out. In sum; the *res gestae* of the case.

Lastly, in his reply brief Johnson cites to, and discusses, our recent unpublished opinion in *Elliott v. Commonwealth*, 2021-SC-0550-MR, 2023 WL 3111751, (Ky. Apr. 27, 2023) (unpublished), which concerns KRE 404(b), and asserts that such opinion "is indeed instructive as to how this Court should approach this case." In *Elliott*, we applied the same standard found in *Bell* as we have done in this opinion. While Johnson was not charged with any theft or robbery offenses (despite admitting to taking items including a firearm), the testimony regarding what was missing from the victims' residence was *res gestae* of their deaths, the crime scene, and the murder investigation and was truly "inextricably intertwined" with both the murders and repudiation of Johnson's claim of self-defense - unlike in *Elliot* where the evidence required for

9

his firearms conviction was not dependent on, or necessarily wholly intertwined with, showing Elliot possessed or dealt drugs.

**KRE 403**

Johnson also asserts that since "there was no evidence of a robbery or burglary, but only speculation by the detective and the Commonwealth," this Court should view the detective's testimony as more prejudicial than probative pursuant to KRE 403.

Like KRE 404, we review a trial court's ruling under KRE 403 for abuse of discretion. *Partin v. Commonwealth,* 918 S.W.2d 219, 222 (Ky. 1996). *overruled on other grounds by Chestnut v. Commonwealth*, 250 S.W.3d 288 (Ky. 2008). When considering whether to reject relevant evidence under KRE 403, a trial court must consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth. *Id.* at 222 (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.10 at 56 (3d ed. 1993)).

Here, we note that Johnson himself admitted to being a drug dealer, admitted to repeatedly shooting two people, albeit in alleged self-defense, and admitted to taking at least one firearm (the murder weapon) from the victims' residence and throwing it into a lake. Also, the jury heard evidence that Gann's prescription pills were found in the trunk of Fitz's car. The detective's testimony regarding the missing items was speculative because the detective did not observe the trailer before the killings, but that testimony lasted only a

10

short while compared to the entirety of his testimony and such testimony, to the extent it was speculative, was subject to obvious cross examination and was harmless.

The trial court gave Johnson great latitude in telling, and attempting to bolster, his version of the events. We are satisfied that the trial court's determination did not generate undue prejudice outweighing the probative worth of the evidence and, to the extend the trial court's determination could ever be considered error, that it would be harmless and we can "say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689, (Ky. 2009).

### B. Did the trial court err by not allowing Johnson's expert to offer testimony on blood spatter – Preserved

Johnson's last argument is that the trial court committed reversible error when it refused to allow Todd Thorne, Johnson's retained expert, to testify regarding bloodstain patterns or "blood spatter." Johnson claims that it was "clear error" and an abuse of discretion to prohibit his expert from testifying in this area. The Commonwealth responds by arguing that the trial court correctly refused to allow Thorne to testify as an expert on bloodstain patterns "as there was no evidence that his testimony would have been reliable" and even if such determination was in error, it was harmless.

Following the conclusion of Johnson's own testimony, the trial court conducted a *Daubert*[1] hearing in chambers. During this hearing, Thorne

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

11

described himself as a "criminalist" who "uses different disciplines in the forensic sciences and applies those to crime scenes to make determinations as to what may or may not have happened." His specific areas of training are bloodstain pattern analysis, shooting reconstruction, crime scene photography, crime scene reconstruction, and fingerprint identification. He has a bachelor's degree in criminal justice and forensic science, an associate degree in police science, and "a couple of thousand hours or more" specialized training. He retired after 38 years with the City of Kenosha, Wisconsin, Police Department, and according to him, he had "run their forensic bureau" for twenty years and was subsequently working as a private consultant. He testified that he had seen thousands of crime scenes, hundreds of murder scenes, and had testified as an expert on many occasions.

Regarding the findings he had made on behalf of Johnson, Thorne testified that in assessing the investigation performed by law enforcement, he had looked at the investigators' photos, their reports, video, "tool station" [3D scan apparatus] results, met with the medical examiner, reviewed the autopsies, and had visited the scene.

Thorne testified that in his opinion the crime scene was poorly documented, that photographs were under or over-exposed and out of focus and lamented that there were no overall photos or video showing the entirety of the scene, leading him to conclude that it would be difficult to show a jury what happened at a scene.

12

Lastly, he testified that, even with the alleged shortcomings in the investigation, he did examine the blood spatter evidence from the photographs the investigators took and was able to form an opinion. At this point the Commonwealth interjected that, based on Thorne's previous opinion that the crime scene was poorly documented, Thorne could not give a reliable opinion as to the blood spatter evidence.

The trial court did not make any ruling at that time, and Thorne continued with his testimony. He stated that it appeared to him that Gann had been shot at least twice while lying down and Loeffler had been shot once at close range due to the "stippling" but could not do that analysis properly since "you need the gun, targets, take measurements of what's on the face, body part, whatever."

The Commonwealth then questioned Thorne on his opinions regarding the crime scene investigation and Thorne stated that he would be unable to render a precise opinion as to the position of the muzzle of the weapon when it was fired, or where the projectiles wound up, because it was not documented. He did however state that it appeared to him that Gann was on the ground for some of the shots and Loeffler "was seated or almost seated, as if he were getting up or sitting down."

The Commonwealth next questioned Thorne about the methodology and methods in forming his opinions about bloodstains. In response, Thorne testified:

> When you look at the bloodstain evidence in terms of spatter, because it's either spatter or expirated bloodstains, pictures aren't

13

close enough to tell us that. Both of these are spatter patterns. When you look at the formation of what that spatter pattern is, and the geometrical pattern of it, the size, distribution and shape of the droplets, that's projected into the wall, it's not rolling down the wall, it's not dripping down the wall, it's not an arterial spurt pattern where it's severed, it's a spatter pattern. It's a basic bloodstain pattern and based upon the positioning of where Mr. Gann is at the time it makes perfect sense.

The Commonwealth went on to ask Thorne about the 3D scan of the scene and Thorne testified that it was "very poor quality" and was impossible to interpret, stating:

Generally, what's done on crime scenes, there's scales placed next to the blood stains, they take [the scan] at a 90-degree angle. Eventually the couch should have been moved, they should have put scales on there with measurements, you can't depend on a total station to do all of that because you can't . . . you just have to do some of that physically and then you take your picture, so you know where it is from the corner and so on.

Thorne next testified that Gann had a left shoulder injury, two wounds to the mid-back, exiting out his mouth and chest and there was "probable corresponding imperfections in the wall," one being a keyhole entry from a projectile that had become unstable, consistent with having traveled through another mass, but there were "no scales, no photos" of these.

Following his testimony, the Commonwealth challenged Thorne's ability to testify as to his opinion as to what occurred, arguing that pursuant to *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 578-79 (Ky. 2000), that he had failed to establish that any of his testimony met the necessary criteria.

At the conclusion of the hearing, the judge ruled that Thorne could testify about deficiencies in the police documentation of the crime and he could

14

also tell the jury what he would have done differently. The trial judge excluded any testimony from Thorne about the bloodstain-pattern evidence and his opinions on what the bloodstain patterns may have indicated about the position of the victims when they were shot.

Johnson's counsel asked the trial court to determine that Thorne could testify as to what might have been found if the officers had done the work, to which the Court ruled that such opinion testimony would be "speculative."

Johnson argues that it was clear error for the trial court to not make explicit pronouncements regarding why it decided to limit Thorne's testimony and it then abused its discretion by not addressing whether or not Thorne's conclusions would assist the trier of fact. We agree.

In *Miller v. Eldridge,* 146 S.W.3d 909, 913-14 (Ky. 2004), this Court found that the *Daubert* opinion directed trial courts to function as a "gatekeeper" charged with keeping out unreliable evidence, and the court must make two determinations; the first being whether the reasoning or methodology underlying the testimony is reliable, the second being whether it is relevant.

KRE 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto[,]" so long as the testimony is based on sufficient facts or data, is the product of reliable principles and methods, and those principles and methods have been reliably applied to the facts of the case.

15

The Court in *Stringer v. Commonwealth*, 956 S.W.2d 883, 891-92 (Ky. 1997), outlined a four-part test for trial courts to consider in determining the admissibility of expert opinion testimony: (1) whether "the witness is qualified to render an opinion on the subject matter[;]" (2) whether the subject matter of the testimony satisfies *Daubert*; (3) whether "the subject matter satisfies the test of relevancy set forth in KRE 401, subject to the balancing of probativeness against prejudice required by KRE 403[;]" and (4) whether "the opinion will assist the trier of fact per KRE 702."

In this case, we can answer each of those questions in the affirmative. Thorne testified that the bloodstain-spatter evidence had not been documented correctly and he could not use measurements to form certain opinions "because that wasn't done so I don't have that information to work with." However, Thorne testified that he could otherwise form opinions based upon "the documentation of the picture and twenty-eight years of, you know, looking at bloodstains, and running an organization that is the largest in the world for bloodstains."

Here, Thorne was obviously an experienced professional and fully admitted that he did not have the (properly collected) evidence necessary to fully form certain opinions but instead could rely upon his experience and education to form other opinions based upon the evidence that did exist and had been preserved. We cannot see how it would have been wrong to allow Thorne to testify as to what the collected evidence ***did*** tell him about the

16

crimes and the opinions he could form therefrom. Certainly, such testimony passes the test for relevancy and could have assisted the trier of fact.

We can also not perceive any prejudice to the Commonwealth's case given that Throne had already, in the presence of the trial court, been candid not only about his limitations based on the evidence collected, but also his criticism of the collection of that evidence during the investigation. At trial, both the court and the Commonwealth would have been amply prepared to keep Thorne's testimony "in line" avoiding pure speculation. Further, given his voiced criticism of the investigation coupled with his candid admission that such shortcomings hindered his own inquiry, we believe the Commonwealth was prepared for a robust cross examination of Thorne.

However, even with the foregoing, we note that we cannot discern how the exclusion of Thorne's potential additional testimony regarding blood spatter could have persuaded the jury that Johnson was not guilty by reason of self-defense. We can perceive nothing from the record persuading us that Thorne's potential testimony regarding the possible positions of the victims when they were first shot, as evidenced by blood spatter, could bolster or conclusively confirm Johnson's own testimony about the shootings. We are also not persuaded that Thorne's opinions about blood spatter would have significantly affected the ultimate conclusions he may have reached given the abundance of extant investigatory evidence, forensic information and data supplied by the autopsies and photographs of the victims and crime scene, all of which he was able to review.

17

Therefore, while we believe the trial court erred in excluding *all* Thorne's potential opinion testimony on what the bloodstain patterns indicated (evidenced by the data that was collected and reviewed by Thorne) in addition to the obviously speculative testimony on "what he might have found if the officers had done the work," we are satisfied that this error was harmless.

Johnson, by his own admission, shot both victims repeatedly during a drug deal and fled the scene with the drugs and the firearm he had used. We cannot perceive, and will not speculate, how any additional opinion testimony from Thorne would have been so compelling that the jury's verdicts with respect to these deaths would have been affected in any way by such testimony.

## III. CONCLUSION

We affirm Johnson's convictions and sentences by the Breckenridge Circuit Court.

All sitting. VanMeter, C.J.; Bisig, Keller, Lambert, Nickell, Thompson, JJ., concur. Conley, J., concurs in result only.


COUNSEL FOR APPELLANT:

Maureen Sullivan


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General