# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

**THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.**

RENDERED:  JUNE 20, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0317-MR

TRACIE JENT                                                     APPELLANT


V.

ON APPEAL FROM CLAY CIRCUIT COURT
HONORABLE OSCAR G. HOUSE, JUDGE
NO. 21-CR-00092


COMMONWEALTH OF KENTUCKY                           APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Tracie Jent appeals from her conviction by the Clay Circuit Court following a jury trial. The jury determined that Jent was guilty of vehicular homicide pursuant to Kentucky Revised Statutes (KRS) 507.060. She received a twenty-year sentence. Jent appeals to this Court as a matter of right.

Finding no grounds for reversal, we affirm.

## I. FACTUAL AND LEGAL BACKGROUND

Jent and Michael Ritchie were in a long-term relationship marked by both violence and substance abuse. The day before the fatal collision, on May 29, 2021, Jent and Ritchie were camping at Levi Jackson State Park while Ritchie was working nearby in London, Kentucky. According to Jent's later testimony, Ritchie noticed Jent glancing at a couple in a parking lot of a

restaurant where they had stopped, called Jent "slut" and began hitting her. Jent admitted to taking "two puffs" of methamphetamine when Ritchie offered to share his pipe with her around noon that day. Jent also admitted to feeling high for about four or five hours afterwards and not going to sleep that night until 4:30 a.m. the next day. Jent also admitted to taking Xanax although the drug was not identified in her later blood analysis.

According to Jent's testimony, on May 30, 2021, the day of the collision, she and Ritchie went shopping in London, Kentucky and then dined at a Mexican restaurant where she drank two margaritas at around 3:00 p.m. Following their meal, the couple stopped at a liquor store and bought a bottle of Jim Beam bourbon. Ritchie and Jent then began driving on the Hal Rogers Parkway (the parkway) back to the mobile home they shared in Perry County. During this drive, Ritchie pulled over and began assaulting her. Jent pushed the Jeep Renegade's OnStar button. When the operator responded Ritchie pulled a gun and told Jent to say that the button was pushed by accident. The 911 dispatcher who answered did not believe the button was pushed by accident and stayed on the line, heard Ritchie assaulting Jent, and dispatched an officer to the scene.

Ritchie exited the Jeep and ran on foot from the scene. The responding Leslie County Deputy Sheriff, Deputy Bobby Roberts, arrived and found Jent in the Jeep with visible injuries. Jent declined an offer of an ambulance and was then instructed by Deputy Roberts to wait in the Jeep while he attempted to locate Ritchie. Instead of remaining at the scene as instructed, after the deputy

2

stepped away Jent started the Jeep and left the scene first driving to the Walmart in Manchester where she waited for thirty minutes before driving in the direction of London, Kentucky. She later turned around on the parkway and headed back towards Perry County; according to Jent she intended to take the Jeep to Ritchie's parents' home.

On the parkway, at approximately 8:30 p.m., Jent's Jeep attempted to pass in a no passing lane along a two-lane section of the parkway and collided with a Chevrolet Cruze driven by Tyler Richardson. Richardson testified he saw the Jeep enter his lane and he applied his brakes and attempted to maneuver his Cruze to the road's shoulder but was unable to avoid the impact. The force of the impact caused both cars to become airborne, "make a complete 180" and land on opposite sides of the road. The vehicles collided with such force that the Jeep's engine was thrown from the wreckage and landed in middle of the parkway. Richardson's wife, Elizabeth Richardson, was in the passenger seat of their Cruze and died instantly.

Numerous witnesses were able to testify to Jent's reckless and erratic driving of the Jeep and the ultimate collision. John Wood was on his way home on the parkway from spending the holiday weekend visiting his parents. He was driving a truck while his wife Brittany Wood followed behind him in a Nissan Rogue. John saw the Jeep pass his wife and run his wife off the road. John further testified to Jent driving recklessly, weaving all over the parkway and crossing the white and yellow lines.

3

Brittany testified about Jent running her off the road. Brittany described Jent's Jeep as being so close to her driver's door that she could have touched it while she, Brittany, swerved onto the shoulder to avoid a collision. After passing Brittany, Jent passed John.

Both John and Brittany witnessed Jent's Jeep finally collide with the Richardsons' Cruze. Jent came into a curve of the road, and it appeared to them as if she did not attempt to steer but instead continued straight and into the Richardsons' lane. They testified Jent's Jeep hit the Richardsons' Cruze with enough force that it rotated the Cruze into Brittany's lane and she could not avoid impacting the rear of the Cruze. Brittany exited her Rogue, and as an ER nurse, tried to provide care to Elizabeth but it was obvious that she was deceased.

Jeffrey Hughes was also driving along the parkway and saw Jent's Jeep swerving "white line to white line," at one point bouncing off a guardrail. He saw Jent tailgating Brittany's Rogue. He saw Jent's Jeep leave its lane of traffic and hit the Cruze. Hughes stopped and saw Jent standing outside of her vehicle and heard Jent telling bystanders that her husband had been the driver and had run off. Hughes testified that Jent was the only occupant in the Jeep.

Michael France was traveling to visit his mother who lived in Hazard and testified he saw Jent's Jeep driving erratically, going into oncoming traffic and forcing Brittany's Rogue off the parkway. When the collision occurred, France called 911 to report it. France also heard Jent claiming that her husband had been driving and had fled.

4

Jent was subsequently taken to an area hospital where a blood draw was performed for toxicology analysis. Jent's blood was drawn at approximately 10:30 p.m., which was within two hours of the accident. This testing showed Jent's blood-alcohol concentration (BAC) was 0.058. Jent's blood-test results also revealed 160 nanograms of methamphetamine and 22 nanograms of amphetamine per milliliter (NG/ML).

Kentucky State Police Trooper Dackery Larkey was the detective and accident reconstructionist who responded to the collision scene. Larkey suspected Jent of driving under the influence based upon her admitting to drinking the day of the collision and the witnesses' statements about her reckless driving. Trooper Larkey later interviewed Jent and she admitted that she had a frozen margarita the day of the accident and took Xanax the day before. Prior to this interview, Ritchie had been located by police and he stated that Jent had also taken shots of Jim Beam bourbon on the day of the accident.

Sergeant Jerry Jones with the Kentucky State Police Critical Incident Response Team analyzed the event data recorder from the Jeep. The data revealed that Jent never applied the brakes before the collision.

On September 16, 2021, Jent was indicted for the murder of Elizabeth Richardson pursuant to KRS 507.020(b) which criminalizes "the operation of a motor vehicle under circumstances manifesting extreme indifference to human life [when one] wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person."

5

Jent's four-day trial began on May 15, 2023. Jent's erratic operation of her motor vehicle was not contested. Instead, the trial centered on whether Jent's erratic driving was caused by her ingestion of alcohol, methamphetamine, and amphetamine or, as Jent theorized, was attributable to trauma caused by Ritchie's assault on her and the couple's overall domestic situation.

Dr. Stephanie Marco, a toxicologist with National Medical Services (NMS) Labs, quantified the amount of methamphetamine in Jent's blood sample at 160 NG/ML of methamphetamine and 22 NG/ML of amphetamine. Dr. Marco testified that amphetamine is a metabolite of methamphetamine and effects are like methamphetamine with both substances affecting impairment. According to Dr. Marco, the amount of methamphetamine in Jent's blood sample actively affected her but, based on the concentration alone, she could not determine impairment since, the level of impairment would depend on the tolerance of the user. Dr. Marco explained that while she could "say that [methamphetamine] was active" she could not extrapolate what Jent's behaviors were to be able to say whether she was impaired or not. When the Commonwealth presented Dr. Marco with a hypothetical similar to Jent's where erratic driving behaviors are shown, Dr. Marco testified that such driving suggested a stimulant use such as methamphetamine. She further explained that the concentration of methamphetamine in Jent's blood, taken at 10:30 p.m., was "actively having an effect" on Jent and that with a concentration of 160 NG/ML of

6

methamphetamine, she would have been more prone to engage in risky behavior during the stimulating phase of her drug use.

Jent called Dr. Harry Plotnick who testified he could not conclude that an individual under circumstances like Jent's would have been too impaired to operate a motor vehicle. Dr. Plotnick stated that there was insufficient information to determine whether Jent's driving was impaired by methamphetamine, amphetamine, or a combination of both and opined that Jent's BAC was below .08 where impairment is presumed. *See* KRS 189A.010. He also testified that "in this case, you've got a depressant drug [alcohol] and a stimulant drug [methamphetamine] and it is even possible they had off-setting effects within a reasonable degree of scientific probability."

Jent also called Dr. Charles Heller who specializes in intimate-partner violence. Dr. Heller had evaluated Jent three times for a total of six hours and discussed her relationship with Ritchie. Dr. Heller testified he had diagnosed Jent with battered-woman syndrome and explained that abusive relationships cause confusion, anxiety, depression, and difficulty coping. He also testified that substance abuse can interfere with relationships, and in this case, Ritchie's alcohol and drug use impacted the couple's relationship. Dr. Heller also determined Jent to be suffering from Post Traumatic Stress Disorder (PTSD) and opined that the abusive situation Jent found herself in that evening with Ritchie would cause confusion, anger, and extreme anxiety making her less able to cope and interrupting her cognitive ability.

In addition to being instructed on murder, the jury was also given instructions on second-degree manslaughter, reckless homicide and, at the request of Jent's counsel, vehicular homicide under KRS 507.060.

The jury found Jent guilty of vehicular homicide and recommended she serve twenty years, the maximum sentence allowable for the offense which is a Class B felony. The trial court sentenced Jent in accordance with the jury's recommendation.

## II. ISSUES

Jent argues the trial court erred by: (1) denying her motion for a directed verdict; (2) giving an improper jury instruction for vehicular homicide; (3) allowing improper character evidence to be admitted; and (4) permitting improper victim impact testimony during the Commonwealth's opening statement and closing arguments. Jent also argues, (5), that these errors resulted in cumulative error.

### A. Was Sufficient Evidence Presented of Jent's Impairment to Support her Conviction?

Jent's counsel moved for a directed verdict at the close of the Commonwealth's case and again at the close of the defense's case. In considering whether a motion for directed verdict should be granted, "[t]he trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

As stated in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991):

8

If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appeal, the denial of a directed verdict motion is reviewed to determine whether "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then is the defendant is entitled to a directed verdict of acquittal." *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017) (quoting *Benham*, 816 S.W.2d at 187).

Jent argues that under the instruction given to the jury on vehicular homicide, she could only be guilty if the Commonwealth proved that the collision occurred because she was driving while impaired by "alcohol, methamphetamine or amphetamine, or a combination of both." According to Jent, the combination of her erratic driving, BAC level below the presumption of impairment, and the levels of methamphetamine and amphetamine found in her blood, did not constitute sufficient evidence to substantiate a finding of impairment.

In considering this issue we must address what is required for a conviction of vehicular homicide. In relevant part, KRS 507.060 criminalizes deaths which result from "operation of a motor vehicle . . . under the influence of alcohol, a controlled substance, or other substance which impairs driving ability as described in KRS 189A.010."

In regards solely to alcohol, KRS 18A.010(3)(b) states that when a person's BAC is less than .08, as it was in this case, that while there is no

"presumption that the defendant either was or was not under the influence of alcohol," the BAC reading "may be considered, *together with other competent evidence*, in determining the guilt or innocence of the defendant." (Emphasis added).

Jent is correct that conflicting testimony was given as to whether Jent was impaired at the time of the accident. Jent sought to show that, although she did have alcohol and illegal stimulants in her system, the levels of such substances were not high enough to definitively prove impairment. She also wanted the jury to believe that the choices she made that day in leaving Deputy Roberts, driving away in the Jeep, driving towards London, and then deciding to make a U-turn and drive towards Perry County, while driving in a wholly reckless manner were the result of her being previously assaulted by Ritchie and the cumulative result of an abusive relationship with him.

While Jent's level of impairment may have been at issue, proof of her alcohol intake and the presence of methamphetamine and amphetamine in her blood was not. As succinctly explained by Dr. Marco to the jury, the concentration of methamphetamine in Jent's blood sample was "actively having an effect" on Jent at the time of the accident. Additionally, multiple witnesses testified about the extremes of Jent's reckless driving and this too could be weighed by the jury as being caused by either her mental state, impairment, or a combination thereof. The jury heard sufficient "competent evidence" from which it could infer, from the full circumstances leading up to the collision,

10

that Jent was impaired at the time and it would have been inappropriate for the trial court to resolve this issue by granting a directed verdict.

## B. Was the Jury Instruction for Vehicular Homicide Improper or Did it Otherwise Deny Jent a Unanimous Verdict?

Jent's counsel requested a jury instruction on vehicular homicide and such was granted. However, the jury instruction chosen by the trial court differed from that submitted by Jent's counsel. Jent argues that the instruction given did not comport with the statutory language and denied her a unanimous verdict.

In addition to being instructed on murder, the jury was also given instructions on second-degree manslaughter (KRS 507.040) for wantonly causing the death of another person); reckless homicide (KRS 507.050) for causing the death of another person through recklessness; and, at the request of Jent's counsel, vehicular homicide under KRS 507.060. The vehicular homicide statute had only been signed into law by Governor Beshear the month prior[1] to Jent's trial and does not contain any element of *mens rea* like the other instructed crimes and instead focuses solely on the issue of whether the vehicle's operator was "under the influence of alcohol, a controlled substance, or other substance which impairs driving ability. . . ." KRS 507.060(1)(b).

---

[1] On March 27, 2023, Governor Beshear signed House Bill 262 titled "Lily's Law" into law which created a new section of KRS Chapter 507 for vehicular homicide. The law made vehicular homicide a Class B felony, punishable by not less than ten years nor more than twenty years in prison. 2023 Ky. Acts ch. 111, sec. 4.

11

The gravamen of Jent's arguments focus on whether the jury instruction given by the trial court properly reflected the necessary element(s) of this crime and whether or not the conjunctive "or" found in both the statute and in the jury instruction caused a unanimity issue. According to Jent, such alleged unanimity error arises from the instruction being a "combination instruction" where there was insufficient evidence to determine guilt under either of two "alternative theories" presented (impairment due solely to alcohol or impairment due solely to a controlled substance).

The jury instruction on vehicular homicide proffered by Jent's counsel read:

> A. That in Clay County on or about May 30, 2021, and before the finding of the Indictment herein, she caused the collision which resulted in the death of Elizabeth Richardson;
>
> AND
>
> B. That while doing so she was operating a motor vehicle while *under the combined influence of alcohol and methamphetamine*, a controlled substance, which impaired her driving ability and thereby caused the death of Elizabeth Richardson.

(Emphasis added).

The trial court rejected Jent's offered instruction and chose the following:

> A. That in Clay Count, Kentucky on or about May 30, 2021, and before the finding of the Indictment herein, she caused the collision which resulted in the death of Elizabeth Richardson;
>
> AND
>
> B. That in so doing, she was operating a motor vehicle *while under the influence of alcohol or methamphetamine,* a controlled substance, which impaired her driving ability and thereby caused the death of Elizabeth Richardson.

12

(Emphasis added).

KRS 189A.010, cited by KRS 507.060, provides for multiple theories of intoxication including the combination of substances.

> (1) A person shall not operate or be in physical control of a motor vehicle anywhere in this state:
>
> . . . .
>
> (b) While under the influence of alcohol;
>
> (c) While under the influence of any other substance *or combination of substances which impairs one's driving ability;*
>
> (d) While the presence of a controlled substance[2] listed in subsection (12) of this section is detected in the blood, as measured by a scientifically reliable test, or tests, taken within two (2) hours of cessation of operation or physical control of a motor vehicle;
>
> (e) *While under the combined influence of alcohol and any other substance which impairs one's driving ability*[.]

(Emphasis added).

In Jent's case, the jury instruction utilized by the trial court reading, "under the influence of alcohol or methamphetamine" precisely mirrors the vehicular homicide statute's use of the conjunctive "or" in its language, "under the influence of alcohol, a controlled substance, or other substance." We cannot assign error to a trial court for providing the jury with an instruction that follows the very language of the underlying criminal statute.

---

[2] The methamphetamine found in Jent's blood is a statutory "controlled substance." KRS 189A.010(12)(l).

13

When preserved for appellate review, a jury instruction that actually misstates an element of the offense "gives rise to a strong presumption of prejudice and requires reversal unless the Commonwealth can establish that the error was harmless beyond a reasonable doubt." *Staples v. Commonwealth*, 454 S.W.3d 803, 822 (Ky. 2014). In this case, however, we are satisfied that the instruction given by the trial court did not prejudice Jent and was not in error.

The language of KRS 507.060 is clear that the emphasis of the statute is a driver's overall impairment, *not* the substances which alone or in concert cause the impairment. It is impairment itself which is *the* essential element to a conviction and is what must be proved for conviction.

We similarly reject Jent's contention that the trial court's instruction denied Jent a right to a unanimous verdict. Jent argues that the jury instruction which seemingly indicated that the jury must determine that Jent was impaired by alcohol acting on its own *or* of methamphetamine acting on its own, invited a unanimity error wherein not all members of the jury may have actually agreed upon which of the two substances effectively caused Jent to be impaired. Instructions that deny a defendant the unanimous verdict also violate the right to due process under the Fourteenth Amendment of the United States Constitution. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

Jent argues that the instruction given was in fact a "combination instruction" which permitted her conviction of the same offense under either of alternative theories (alcohol or methamphetamine). Such an instruction does not deprive a defendant of his right to a unanimous verdict, "so long as there is

14

evidence to support a conviction under either theory." *Robinson v. Commonwealth,* 325 S.W.3d 368, 370 (Ky. 2010). This Court has upheld other combination instructions for driving under the influence in which the jury instruction allowed conviction for having a blood alcohol level above a certain amount or being under the influence of a substance that impairs driving ability, and the Court held that "[w]hile the alternative means do indeed require different acts, the effect is the same and there is no prejudice so long as evidence is presented from which the jury could reasonably believe both of the subsections had been violated." *Evans v. Commonwealth,* 45 S.W.3d 445, 447 (Ky. 2001).

The Commonwealth offered expert testimony supporting the conclusion that Jent was under the active effect of methamphetamine at the time of the collision. While Jent offered contradictory testimony on the effects of the methamphetamine on her, it was the province of the jury to weigh the conflicting testimony of witnesses.

While Jent's BAC may have been below the 0.08 *per se* limit found in KRS 189A.010(1)(a), such does not mean the whole of the evidence could not support a determination that she was impaired by alcohol. Jent could still be found to be impaired with a BAC below .08 in accord with KRS 189A.010(3)(b) which provides:

> If there was an alcohol concentration of 0.04 or greater but less than 0.08 based upon the definition of alcohol concentration in KRS 189A.005, that fact shall not constitute a presumption that the defendant either was or was not under the influence of alcohol, but that fact may be considered, together with other competent evidence, in determining the guilt or innocence of the defendant.

15

Reasonable jurors could determine that Jent was under the influence of alcohol from her admissions that she drank two margaritas that day, her BAC taken after the collision, and her consistently erratic driving. The jury could properly infer that Jent was impaired by either or both alcohol and methamphetamine. Therefore, there is no unanimity error.

The clear intent of KRS 507.060 is criminalizing *impairment,* which is what presents a risk of death to innocent motorists and pedestrians, and not parsing which precise substance in an operator's body may have solely caused the impairment on its own.

We have no doubt that a jury convicting Jent of being impaired by "alcohol or methamphetamine" would have convicted her of being impaired by "the combined influence of alcohol and methamphetamine." It would be illogical to conclude otherwise.

## C. Was Additional Evidence of Jent's Substance Abuse Improperly Allowed?

Jent argues that testimony taken by the Commonwealth from Jent's own expert, Dr. Heller, was a "piling on" of evidence of substance abuse which should have been excluded under Kentucky Rules of Evidence (KRE) as "evidence of a defendant's character or other crimes."

During the cross-examination of Dr. Heller, whom Jent had called to testify about the impact of domestic abuse on her actions, the Commonwealth asked Dr. Heller if he remembered Jent telling him that she and Ritchie were abusing opioids during their relationship. Jent's counsel objected stating, "I

16

think it's character evidence for potentially having a dependency on prescription substances, I don't think that's relevant. I think it's character evidence." The trial court overruled the objection and the Commonwealth asked, "the fact that you've got this type of drug use going on in this relationship, is that going to make the relationship more difficult?" Dr. Heller stated in response that drug use could increase the conflict between a domestic abuser and the abuser's victim, which cast Jent in the light of a domestic victim instead of a substance abuser. The Commonwealth then asked, "Mr. Ritchie and Ms. Jent, if they're both using and abusing, does that make things worse?" Dr. Heller agreed with this saying, "I think it could." The Commonwealth next asked if Dr. Heller saw couples in his practice who were both "using and abusing" various drugs and Dr. Heller responded that it was difficult to treat a victim of domestic abuse and her abuser at the same time. The Commonwealth "pressed on" according to Jent by asking if substance abuse treatment was part of working with abused individuals. Dr. Heller agreed that this was the goal. The Commonwealth replied, "Right, and the fact that they are using and abusing drugs, is that going to affect their reasoning judgment, their emotions?" Dr. Heller agreed stating, "Yes."

On appeal Jent argues such questioning was not relevant because she had admitted to using methamphetamine the day prior to the collision, her blood test showed usage, and "[t]hus, the evidence of past use was irrelevant."

We decide issues regarding a trial court's determinations on the admissibility of such evidence under an abuse of discretion standard,

17

determining whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principals." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Beginning our analysis, KRE 404(b) states:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

As a general rule, KRE 404(b) prohibits the introduction of other criminal acts. As we have previously stressed, KRE 404(b) is "exclusionary in nature," and as such, "any exceptions to the general rule that evidence of prior bad acts is inadmissible should be 'closely watched and strictly enforced because of [its] dangerous quality and prejudicial consequences.'" *Clark v. Commonwealth*, 223 S.W.3d 90, 96 (Ky. 2007) (quoting *O'Bryan v. Commonwealth*, 634 S.W.2d 153, 156 (Ky. 1982)). To determine the admissibility of prior bad act evidence, we have adopted the three-prong test described in *Bell v. Commonwealth*, 875 S.W.2d 882, 889-91 (Ky. 1994), which evaluates the proposed evidence in terms of: (1) relevance, (2) probativeness, and (3) its prejudicial effect.

18

KRE 404(b) would be applicable if the evidence was introduced with the sole intention of showing that Jent was acting in conformity with her character to abuse methamphetamine (prior usage) when the charged bad act (vehicular homicide) occurred (*i.e.* "prove the character of a person in order to show action in conformity therewith"). *Kentucky Farm Bureau Mut. Ins. Co. v. Rogers*, 179 S.W.3d 815, 819 (Ky. 2005).

> In other words, evidence of other acts cannot be used to show a propensity or predisposition to again commit the same or a similar act. This is a codification of the "venerable rule that a defendant may not be convicted on the basis of low character or criminal predisposition, even though such character or predisposition makes it appear more likely that the defendant is guilty of the charged offense."

*Southworth v. Commonwealth*, 435 S.W.3d 32, 48 (Ky. 2014) (quoting *Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky. 1992)).

Here, however, the evidence was of such a nature as to be "inextricably intertwined with other evidence essential to the case." KRE 404(b)(2). Jent herself introduced hearsay evidence of Ritchie's drug usage to bolster her claims of being the victim of a long-abusive relationship which was the cause of her actions on the day of the fatal collision. In these respects, the evidence offered was both probative and relevant. From one perspective, Jent's usage of controlled substances during her relationship with Ritchie,[3] could have been

---

[3] Jent had been convicted of two felonies (one federal, one state) prior to her relationship with Ritchie which were associated with possession with intent to distribute controlled substances. While Jent admitted during her direct examination to being a convicted felon, evidence of her prior convictions and sentences was not admitted until the penalty phase of her trial.

attributed to her victimization by Ritchie and served as additional evidence of the abusive nature of their relationship. Jent "opened the door" regarding her relationship with Ritchie by focusing her defense on the effects that relationship had on her actions the day of the collision and the jury was entitled to a complete understanding of that relationship. As such, the nature of that relationship, including the parties' drug usage as a part thereof, was *res gestae* and inextricably intertwined with the collision and it was not an abuse of discretion for that information to be allowed in to provide a "complete, unfragmented, unartificial picture" to the jury of how the events transpired. *Major v. Commonwealth,* 177 S.W.3d 700, 708 (Ky. 2005).

**D. Were Statements Made by the Commonwealth Concerning the Victim Impermissible Victim Impact Evidence and/or Prosecutorial Misconduct?**

Jent did not raise an objection during trial to the statements considered here and therefore, the issue is unpreserved. Therefore, Jent requests palpable error review arguing that the statements made reversible error because they were so "flagrant" as to have "render[ed] the trial fundamentally unfair." *Dickerson v. Commonwealth,* 485 S.W.3d 310, 329 (Ky. 2016).

Under the Kentucky Rules of Criminal Procedure (RCr) 10.26., "[t]o determine if an error is palpable, 'an appellate court must consider whether on the whole case there is a substantial possibility that the result would have been any different.'" *Davis v. Commonwealth,* 620 S.W.3d 16, 30 (Ky. 2021) (quoting *Commonwealth v. McIntosh,* 646 S.W.2d 43, 45 (Ky. 1983)).

The statements at issue were made by the Commonwealth during its opening statement and during its closing arguments.

During its opening statement, the Commonwealth reminded the jury that Elizabeth Richardson, the victim, was a nurse and mentioned the need for health care workers in Kentucky stating,

> Elizabeth Richardson lost her life at the scene. There was no chance to do anything for her. She was dead. Her life ended, 27 years old, a registered nurse. All the years of her life that could have been lived, the benefits that she could have borne for the state of Kentucky, working as a registered nurse, which is a field that's desperately needed, is lost. That was all lost because of the criminal acts of Tracie Jent on that day.

During its closing argument, the Commonwealth reiterated the victim's profession and the impact of her loss stating: "She should have been able to get to her home in Pulaski County safely and get up and go back to her job and work as a nurse. She could have been able to be with her family, to help people that needed help as a nurse."

**1. Victim Impact**

Questions or statements designed to elicit "victim impact" evidence are limited to the sentencing phase of a trial pursuant to KRS 532.055(2)(a)(7) which provides for truth-in-sentencing and specifies that during the sentencing phase of the trial, the Commonwealth is allowed to offer evidence regarding "[t]he impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims[.]"

21

Victim impact evidence is typically inadmissible until the penalty phase of the trial, but victim background evidence is generally admissible. *See Roe v. Commonwealth*, 493 S.W.3d 814, 823-24 (Ky. 2015) ("The prohibition of victim-impact evidence during the criminal responsibility phase of trial is deeply rooted in both our precedent Kentucky statutory law."); *Bennett v. Commonwealth*, 978 S.W.2d 322, 325-26 (Ky. 1998) (explaining that victim background information is generally admissible).

Victim impact evidence masquerading as victim background evidence is not permissible as the "introduction of victim impact evidence during the guilt phase is reversible error." *Tackett v. Commonwealth*, 445 S.W.3d 20, 32-33 (Ky. 2014) (quoting *Ernst v. Commonwealth,* 160 S.W.3d 744, 763 (Ky. 2005) *overruled on other grounds by Mason v. Commonwealth*, 559 S.W.3d 337, 34-42 (Ky. 2018)).

One way to determine the difference between victim impact evidence and victim background evidence is whether the evidence is "aimed primarily at appealing to the jurors' sympathies" or "providing an understanding of the nature of the crime[.]" *Id. See Ernst*, 160 S.W.3d at 763–64 (collecting cases of appropriate victim background evidence contrasted with cases in which improper victim impact testimony was given). "[H]ighly inflammatory evidence" with "little or no probative value" which concerns the "terrible loss" suffered based on the crime is not appropriate for introduction during the guilt phase of a trial. *Ice v. Commonwealth*, 667 S.W.2d 671, 675-76 (Ky. 1984). Arousing the

jurors' sympathy "although relevant to the issue of penalty, is largely irrelevant to the issue of guilt or innocence." *Bennett*, 978 S.W.2d at 325.

The Commonwealth's opening statement, by intentionally going beyond a singular mention of Elizabeth Richardson's profession and proceeding to opine that her loss, as a nurse, would impact the citizenry as a whole, constituted impermissible victim impact testimony because it established the terrible consequences of the defendant's actions on life in the Commonwealth going forward and was likely to arouse the jurors' sympathy.

However, while improper, the opening statement cannot be viewed as palpable error. In *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006), we explained that the description of palpable errors as being "errors so fundamental as to threaten a defendant's entitlement to due process of law," is not itself a standard but an explanation as to the "degree of prejudice" that must be demonstrated in order for a court to determine there is a "substantial possibility" a different result would have resulted but for the unpreserved error. We conclude that the potential prejudice suffered by Jent from the Commonwealth's statements regarding the victim were not "so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* at 5. Indeed, Jent wholly fails to persuade us that there is any possibility that, but for this statement, a different result from her four-day trial would have occurred, and she would not have been convicted of vehicular homicide. *Id.* at 3.

Opening statements and closing arguments are fundamentally different. The opening statement is a roadmap explaining what the jury will hear before it knows anything about the case while the closing argument reminds the jury about the evidence they have seen and what inferences may be drawn from such evidence. Given the limited nature of the statement made in the closing argument and the wide latitude that prosecutors are given in making closing argument, *see Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky. 1987), we do not agree with Jent that the prosecutor made an impermissible victim impact statement in his closing argument even though such statement was similar to the one he made in his opening statement.

### 2. Prosecutorial misconduct

Jent also characterizes the Commonwealth's statements as prosecutorial misconduct. We employ a four-factor test to determine whether a prosecutor's improper comments constitute reversible flagrant misconduct: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Dickerson,* 485 S.W.3d at 329. In reviewing allegations of prosecutorial misconduct, appellate courts are to focus "on the overall fairness of the trial," reversing only if the misconduct was "so serious as to render the entire trial fundamentally unfair." *Soto v. Commonwealth,* 139 S.W.3d 827, 873 (Ky. 2004).

24

We conclude that the remarks as to the loss incurred by society by a nurse being killed did not tend to mislead the jury and only mildly prejudiced the accused, they were isolated, and while deliberately placed before the jury they cannot overcome the strength of the evidence against the accused, especially where the trial focused not on whether Jent had committed the crime but rather on whether intoxication or emotional turmoil caused her to commit the crime. Accordingly, Jent has failed to establish that prosecutorial misconduct occurred.

**E. Do Combined Errors Merit Reversal for Cumulative Error?**

Jent argues that combined errors she raises warrant reversal. The Commonwealth insists that to the extent any error is found to have occurred, such errors were harmless, relying on the argument that the evidence against Jent was overwhelming.

Cumulative error warrants reversal if the trial errors that occurred served to make the trial "fundamentally unfair." *Mason v. Commonwealth,* 559 S.W.3d 337, 345 (Ky. 2018). "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth,* 313 S.W.3d 577, 631 (Ky. 2010). *See Walker v. Engle,* 703 F.2d 959, 963 (6th Cir. 1983) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair").

While an error occurred when the Commonwealth made a victim impact statement within its opening statement, this was a relatively minor and isolated

25

matter which occurred during the course of a lengthy trial. Considering its singular nature and all the evidence supporting the verdict, no cumulative error occurred meriting reversal.

### III. CONCLUSION

We affirm Jent's conviction and the sentence imposed by the Clay Circuit Court.

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Erin Hoffman Yang
Kathleen Kallaher Schmidt
Assistant Public Advocates


COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General

Melissa A. Pile
Assistant Attorney General